**In re SILVER BRIDGE DISASTER LITIGATION.**

**M. D. L. No. 39.**

United States District Court,
S. D. West Virginia.

July 12, 1974.

John D. Holschuh and Alexander, Ebinger, Holschuh, Fisher & McAlister, Columbus, Ohio, and Harry Alan Sherman, Pittsburgh, Pa., for plaintiffs.

Lawrence Klinger, U. S. Dept. of Justice, Washington, D. C., for defendant United States.*

FRANK A. KAUFMAN, District Judge.

Late in the afternoon of December 15, 1967 the Silver Bridge, spanning the Ohio River from Point Pleasant, West Virginia to Gallipolis, Ohio, collapsed. Thirty-one automobiles fell into the river; forty-six persons died and others were injured. As a result, fifty-six suits were filed in the United States District Courts for the Districts of West Virginia, Ohio and Maryland. In those fifty-six cases, one or more of the following parties were named as defendants: United States Steel Corporation, J. E. Greiner Co., and certain of its predecessors and successors (known as the "Greiner" defendants), the State of Ohio, and the United States of America.[1] In only fifteen of those cases was the United States named as a defendant. Two of those fifteen cases are duplicates of two other cases. All fifteen involve wrongful death actions. A few of the original fifty-six suits were brought to recover damages for loss of property. Jurisdiction exists pursuant to 28 U.S.C. § 1332, except with regard to the claims against the United States in connection

---

* These counsel represent the parties with regard to the claims in this litigation which have not been settled as of this time. Numerous other counsel have appeared in this litigation at prior times.

1. Additionally, certain actions are pending in the Court of Claims of the State of West Virginia.

with which jurisdiction is present under 28 U.S.C. § 1346(b).[2]

On April 20, 1970 and subsequent thereto, acting pursuant to 28 U.S.C. § 1407, the Judicial Panel for Multidistrict Litigation transferred the cases from the Southern District of Ohio and the District of Maryland to the Southern District of West Virginia, and together with Chief Judge Haynsworth of the United States Court of Appeals for the Fourth Circuit, designated the undersigned to sit in that district as the section 1407 transferee judge. In re Silver Bridge Disaster, 311 F.Supp. 1345 (Jud.Pan.Mult.Lit.1970).

On November 16, 1973, all of the claims of the plaintiffs against United States Steel and the "Greiner" defendants[3] were settled, thus disposing entirely of forty-one of the fifty-six cases. At this time, only the claims against the United States Government in the remaining fifteen cases are pending. All of those cases were instituted in the Southern District of Ohio.

Plaintiffs base their claims against the United States Government upon three theories: (1) federal approval of the bridge's design and construction ("Issue I"); (2) activities of the United States in and around the Ohio and Kanawha Rivers between 1927 and 1967 ("Issue II"); and (3) the 1952–1954 Ohio River Crossings Survey ("Issue III").

## ISSUE I

### A.  The Factual Background [4]

Sometime prior to March 1926 the Gallia County Ohio River Bridge Company (hereinafter "Bridge Company"), an Ohio corporation, was incorporated for the purpose of constructing a toll bridge across the Ohio River between Gallipolis, Ohio and Point Pleasant, West Virginia.[5] The Bridge Act of 1906 (currently codified with modifications as 33 U.S.C. § 491 et seq., however, requires, inter alia, congressional consent to construction of any bridge over navigable waters of the United States. In March, 1926 two bills were introduced in the Congress to permit construction by the Bridge Company of the Silver Bridge. Senate Bill 3499 made consent conditional upon approval by the Secretary of War and the Chief of Engineers of the War Department, of the plans and specifications, including the determination that the plans be "  *   *   * also satisfactory from the standpoint of volume and weight of the traffic which will pass over it." In contrast, House Bill 10169 simply granted consent to build "in accordance with the provisions" of the Bridge Act of 1906. On March 16, 1926, Acting Secretary of War, Mac Nider, informed the House Commerce Committee that the War Department had no objection to the House Bill. As to the Senate Bill, Secretary Davis wrote on March 20, 1926 to Senator Jones of the Senate Commerce Com-

2.  Prior to transfer under 28 U.S.C. § 1407, the State of Ohio was dismissed as a defendant in all but one of the suits against it; in the remaining case, the State was never served.

3.  The consulting engineers who did business as a partnership in the middle 1920's and have since gone through a succession of entity changes.

4.  The parties have stipulated to the facts set out *infra* with regard to the construction of the Silver Bridge.

5.  Gallipolis, Ohio and Point Pleasant, West Virginia are located on opposite banks of the Ohio River. In 1926 each community had an expanding population; each was a prosperous regional commercial center and growing industrial area; each had railroad service. Moreover, roads for automobile traffic running from the capital cities of Ohio and West Virginia to Gallipolis and Point Pleasant, respectively, had recently undergone or were then undergoing improvement. No bridge, however, then directly connected the towns; the nearest bridges were forty-two miles downstream and fifty-one miles upstream.

mittee stating that if the War Department was to be required to approve such bridges from the standpoint of weight and volume of traffic, the same would pose substantially greater duties and work upon that Department.[6] Eventually, Congress simply enacted consent legislation drafted in conformity with a standard form previously developed by the House and Senate Commerce committees for just such bills. Among other things the Act as enacted permitted the Bridge Company to build "at a point suitable to the interests of navigation between a point at\ or near Gallipolis * * * *", and granted congressional consent "in accordance with the provisions" of the Bridge Act of 1906. The special consent as finally passed contained no explicit condition concerning the capacity of the Silver Bridge from the standpoint of volume or weight of traffic, nor did it otherwise refer to construction except in the context of construction costs as they related to the fixing of tolls and condemnation rights by the States.

In December 1926, after the statute's enactment, the District Engineer of the Corps of Engineers of the War Department (hereinafter District Engineer) furnished Form 92b entitled "Application for Approval of Plans of a Bridge to Cross Navigable Waters of the United States". Although Form 92b did not require submission of the Bridge's specifications, it did request submission by the Bridge Company of proposed plans to the extent stated in paragraph 3 of the form. That paragraph provides:

(a) A map showing the proposed location, and the waterway for the distance of 1 mile above and 1 mile below, with the data necessary to enable the Chief of Engineers and the Secretary of War to determine whether the location is a proper one; also an inset sketch or a small scale map showing the general location of the bridge relative to towns in the vicinity and the position of the waterway relative to other waterways of the region.

(b) Plan of the bridge showing the length and height of spans; width of draw openings; position of piers, abutments, fenders, etc., and those features which affect navigation, giving on both horizontal sections and elevations, the outside structure lines separating the area left for navigation from the area occupied by the bridge, and, in figures, the least clear width of openings at right angles to the axis of the channel, also the least clear heights with reference to water surfaces as specified on the reverse side of this sheet.

Instructions on the reverse side of the application include the following:

(e) STRUCTURAL DETAILS.—Only those should be shown which are needed to illustrate the effect of the proposed structure on navigation. . . .

On December 29, 1926, the Bridge Company submitted the construction plans on Form 92b to the District Engineer who in turn forwarded the application and plans to the Chief of Engineers of the Corps, through the Division Engineer. Less than a week later the Division Engineer recommended to the Corps that a Board of Officers be appointed to consider the application. The board which was subsequently convened held a public hearing, and thereafter notified the Corps that the applicant had agreed to move one of the piers forty feet toward the Ohio shore, and that the board recommended approval of the plans as so amended. The amended application then spiraled its way up through government offices until it reached the Secretary of War, who granted the necessary approval.

On April 28, 1927, the contractor for the Bridge Company, the American Bridge Company,[7] (hereinafter "American") seeking a permit for construction

---

6. That letter is set forth in full, *infra* at pp. 953–955.

in navigable waters, sent the District Engineer tracings showing the location of the piers and box type cofferdams to go around them. Those plans did not conform to the plans previously approved by the Secretary of War and the Chief of Engineers. For that reason, no permit issued pending receipt of revised plans. On May 2, 1927 the contractor submitted plans conforming with the officially approved plans, and a week later the Division Engineer approved the permit on the recommendation of the District Engineer.

Soon thereafter, a new District Engineer was appointed who requested a set of plans and specifications for the bridge. In response, the consulting engineers (Greiner) for the Bridge Company, sent the District Engineer a set of plans and specifications. The latter, in accordance with the approved plan, called for a straight wire cable design for the superstructure, but however also included two alternatives for the superstructure in the place of the wire cable design, i. e., (1) a long lay wire rope cable, and (2) heat treated I-bars (sometimes written as "eye-bars"). In a letter accompanying those plans, the consulting engineers wrote the District Engineer as follows:

> In accordance with your request we are sending you a set of plans and specifications for the Point Pleasant Highway Bridge. The cable design calls for a straight wire cable. In asking for bids on the superstructure two alternatives to this, namely, a long lay wire rope cable or heat treated I-bars may be bid upon. We expect to have these bids in within a short time, after which the type of cable will be decided upon and we will forward you additional plans covering this part of the work.

> This bridge is designed with a 22′ roadway and a 5′6″ sidewalk with provision in the future, if traffic demands it, for changing the sidewalk, placing it on brackets outside the stiffening truss, thus increasing the floor width sufficient to provide for three lanes of traffic.

> The bridge is designed for American Society of Civil Engineers H15 loading except that the uniform load used in the design of girders and trusses is increased 50 #, making it 1400 # per lineal foot, and a 42,000 # concentrated load instead of 63,000 #, is used.

> We believe that the two lane bridge as it is being constructed will provide adequately for the volume of traffic using it for many years to come, and that the necessity of moving the sidewalk outside of the stiffening trusses to provide three lanes on the floor for highway traffic is many years in the future.

> You will find in the specifications on pages 4 to 7, inclusive, a complete description of the unit stresses, etc., used in designing the various parts of the bridge.

> We respectfully request approval of the Secretary of War and Chief of Engineers of this bridge as being adequate for the volume and weight of traffic that will use it.

The District Engineer responded:

> Receipt is acknowledged of your letter of the 15th inst., and specifications and set of plans, making request for approval of those plans and specifications for bridge over Ohio River at Mt. Pleasant, W. Va., with reference to their adequacy for the volume and weight of traffic that will use it.

> It is found that no approval of these plans and specifications by the War Department is needed. The original bill provided to Congress for authority for the construction of this bridge (S. 3499 69th Congress, First Session) contained this requirement:

> > "Provided that such bridge shall not be constructed or commenced

---

7. Now a division of United States Steel Corporation and treated by the parties as if it were part of that corporation.

until the plans and specifications thereof shall have been submitted to and approved by the Secretary of War and the Chief of Engineers as being also satisfactory from the standpoint of the volume and weight of the traffic that will pass over it."

The bill as finally enacted however (H.R. 10169, approved May 13, 1926) does not contain this requirement.

The specifications and plans submitted by you are returned herewith.

Subsequent to that exchange of correspondence the Bridge Company contracted with American as general contractor to build a superstructure using I-bars instead of wire cables, and accordingly drew new plans accommodating that change. Apparently, neither the new plans containing the I-bar design, nor any subsequent revision of those plans, were ever submitted to the Secretary of War or to the Chief of Engineers.

During the course of the construction of the substructure of the bridge the District Engineer allowed deviation from the approved plans by permitting the raising of the top of the Ohio shore caisson from 510 to 518 feet. The District Engineer also permitted dumping in the Ohio River of material resulting from the substructure's erection; and had his staff inspect to determine the elevation of both the piers and the bottom of the steel section of the bridge.

In November 1927 American was ready to commence the erection of the superstructure, and informed the District Engineer of its proposed method of constructing the superstructure. The District Engineer, while approving the proposal in principle, reserved the right to require American "to make any changes in the method of erection if found necessary for the safety and convenience of navigation." He further required that American notify a number of "river interests" of American's "proposed operations in the river."

The superstructure was erected from about December 1927 to June 1928. On June 21, 1928 the District Engineer caused the bridge to be inspected for clearances by an inspector. The latter informed the District Engineer that the vertical clearance one hundred feet out from the channel pier was 101.9 feet above low water rather than the planned 102.1 feet—a difference of 0.2 feet, and that further "[t]he channel span Horiz. [horizontal] clearance was found to be 700′ feet center to center piers, which checks with approved plans." The following day, the District Engineer wrote the Chief of Engineers as follows:

The conditions of permit issued by the Acting Chief of Engineers and The Assistant Secretary of War under dates of March 1, 1927 and March 4, 1927, respectively, E.D. 6371 (Gallia Co. O. R. Br. Co.–O.R.) 11/29, to the Gallia County Ohio River Bridge Company of Gallipolis, Ohio, to construct a bridge across the Ohio River at Point Pleasant, W. Va., have been fully complied with and the work completed in substantial accordance with the approved plans.

For a period of three years after completion of the bridge on May 19, 1928, the Secretary of War, pursuant to the consent legislation of May 13, 1926, conducted exhaustive investigations into the cost of the construction of the bridge, and audited the records of the Bridge Company and the consulting engineers. In May 1931 the Secretary of War made a final finding disallowing $90,249.04 of the claimed cost of the bridge which, as set forth *supra*,[8] was relevant to setting of tolls and possible future condemnation.

### B. *Contentions of the Parties*

Plaintiffs assert on the basis of that history that the District Engineer, the Chief of Engineers and the Secretary of the Army should have (a) required the submission for approval of plans, specifications and drawings which were more

8. At p. 5.

complete and which would have disclosed in greater detail the safety of the superstructure design, and the ability of the bridge to handle weights and volumes of traffic; (b) considered and determined safety as an independent element; (c) examined specially the I-bar suspension superstructure when and after the Bridge Company adopted plans for the use of the same; (d) more fully supervised construction of the bridge, including any deviations from the approved plans; (e) employed more qualified assistants in connection with the examination of plans, specifications and drawings; (f) provided an adequate method of testing and inspecting the bridge during and after construction; (g) warned the public, including plaintiffs' decedents, that the Secretary of the Army and the Chief of Engineers had not approved the final plans and specifications and that there were risks and dangers in the existence and the use of the bridge. Moreover, plaintiffs assert that the District Engineer without authority unlawfully and negligently permitted deviation from the approved plans in the construction of the bridge, especially in permitting the I-bar type of superstructure. Finally, plaintiffs contend that the Government's action made the bridge a public nuisance.

Defendant takes the position that (1) even if any of plaintiff's contentions are meritorious, plaintiff's claims are barred because the Federal Tort Claims Act does apply retroactively beyond January 1, 1945; (2) whether or not defendant fully met the requirements of the Bridge Act of 1906, the Government owed no duty to plaintiffs to avoid negligence; (3) the Federal Tort Claims Act does not allow an action in nuisance against the United States; (4) the actions of the Secretary of War, the Chief of Engineers and the District Engineer

were discretionary and thus within the exception established by 28 U.S.C. § 2680(a); and in any event (5) the Government was not in fact negligent.

### C. Retroactivity

When Congress enacted the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. (hereinafter "FTCA"), it explicitly provided in 28 U.S.C. § 1346(b) for retroactivity to January 1, 1945.[9] The negligent acts of the United States alleged by plaintiffs in Issue I, in connection with the construction of the Silver Bridge, all took place between 1926 and 1928—long before the FTCA went into effect. Additionally, many of the acts alleged in Issue II, or which may relate to the type of questions involved in Issue III, took place prior to 1945. Accordingly, the United States Government asserts that all contentions based upon pre-January 1, 1945 negligent acts or omissions are barred regardless of when the injury occurred.

Carnes v. United States, 186 F.2d 648 (10th Cir. 1951), also involved a pre-1945 negligent act giving rise to a later injury. The Tenth Circuit rejected the Government's contention that the United States had not waived immunity for such claims. The Carnes litigation grew out of the crash of a B-24 airplane near Birmingham, Alabama on March 24, 1944. Although the United States guarded the crash site while the plane's remainders were salvaged, plaintiff, a fourteen-year-old boy, slipped through the cordon and picked up an airplane part labeled "Destructor". Nearly a year later, on February 25, 1945, while plaintiff experimented with the destructor, it exploded. In holding the plaintiff's claim actionable, the Court noted (at 650):

> Appellant did not have a claim against the Government until he suf-

9. "That date clearly fixes the limit of retroactivity." Perry v. United States, 170 F.2d 844, 846 (6th Cir. 1948). To the same effect, see Terminal Ry. Ass'n v. United States, 182 F.2d 149, 151–152 (8th Cir. 1950). "Congress in barring claims prior to January 1945 may well have had in mind the foreclosure of claims arising out of the recent war." Oahu Ry. Land Co. v. United States, 73 F.Supp. 707, 708 (D.Hawaii 1947).

fered injury upon which he could have predicated an action in court. It will be noted that the Act [28 U.S.C. § 1346(b)] gives the court jurisdiction of actions *on claims* (emphasis ours) accruing on or after January 1, 1945. The claim accrued, if at all, on February 2, 1945, when appellant was injured. Prior to that time he had no claim againt the Government. He could not have sued the Government. His cause of action, if any he had, accrued on the date he suffered his injury. Under the clear language of the Act, the court had jurisdiction of the cause of action predicated upon this claim.

In pertinent part, 28 U.S.C. § 1346(b) provides:

> * * * [T]he district courts * * * shall have exclusive jurisdiction of civil actions *on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death* caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. [Emphasis added.]

It is the Government's position that in enacting section 1346(b) Congress meant not only to block claims for injury accruing before January 1945, but also claims accruing after that date caused by negligent acts or omissions before 1945. " * * * [W]e must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used. * * * " Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). The meaning expressed by "claim" on the one hand, and by "act or omission" on the other, is ordinarily quite distinct. In *Richards, supra,* the

Court faced an analogous problem: whether Congress, in requiring application to FTCA cases of the law of the place where the "act or omission" occurred, intended to distinguish the locus of the act from the locus of that act's operative effect, when the act and effect transpired in different jurisdictions. The Court held that Congress meant "act or omission" when it said "act or omission".[10]

If Congress had intended to bar claims for injuries suffered after 1945 as a result of pre-1945 acts, it could have transposed the following words "on and after January 1, 1945" so that section 1346(b) would have provided for *claims against the United States for money damages caused by a negligent or wrongful act occurring on and after January 1, 1945.* It is especially appropriate in construing the FTCA to apply the general canon of statutory construction that the Congress said what it intended and intended what it said. "Whatever may be the case with legislation on other subjects, there is every reason to suppose that this particular statute was the result of the most skillful and deliberate draftsmanship and that in its final form it was the culmination of years of patient effort." Niagara Fire Ins. Co. v. United States, 76 F.Supp. 850, 854 (S.D.N.Y.1948) (Medina, J.).

■ Accordingly, plaintiffs are entitled to go forward in this case with regard to all claims which accrued after the year 1944. *Whether* a claim accrues is a matter of state law as incorporated through section 1346(b); however, *when* a claim accrues is apparently a question of federal law. *See* Kossick v. United States, 330 F.2d 933 (2d Cir. 1964); Quinton v. United States, 304 F.2d 234 (5th Cir. 1962); Maryland (Use of Burkhardt) v. United States, 165 F.2d 869 (4th Cir. 1947), all so holding with respect to the term "claim accrues" as it is used in the FTCA's statute of limitations, 28 U.S.C. § 2401.

10. *Richards, supra* is more fully discussed in Part D, *infra* at p. 941.

*Contra,* Tessier v. United States, 269 F. 2d 305, 308, 309 (1st Cir. 1959). That fine distinction, however, presents ·no difficulty here. Regardless of the law resorted to, it is clear that until negligence has an impact which results or will result in injury, no actionable claim exists. That proposition is hornbook law in all states. W. Prosser, Law of Torts § 30, pp. 143–44 (4th ed. 1971). In Howard v. United Fuel Co., 248 F.Supp. 527 (S. D.W.Va.1955), for example, plaintiff was injured in 1963 by the explosion of a gas line. The explosion resulted from negligent installation sometime between 1953 and 1955. The Court, applying West Virginia law, held that limitations did not begin to run when the line was installed, since no right of action for personal injury came into being until the injury occurred. Similarly in applying the FTCA's statute of limitations, the federal courts have held that an actionable claim does not accrue merely upon the occurrence of negligent mis- or non-feasance without or before impact or injury to anyone or anything. In United States v. Reid, 251 F.2d 691, 694 (5th Cir. 1958), Judge Brown wrote in the context of the FTCA's statute of limitations: " * * * Ordinarily there is a coincidence of negligent act and the fact of some damage. Where that occurs the cause of action comes into being * * * * [I]t is not the wrongful, *i. e.,* negligent act, which gives rise to the claim. For there must be some damage caused by it. Until there is *some* damage, there is no claim * * *." (Emphasis in original.) Moreover, with respect to plaintiff's allegation that defendant violated its duty to warn the public, such failure to perform that duty—assuming *arguendo* only that there was such a duty— would be continuous up through the time the bridge collapsed. *See, e. g.,* Trombley v. Kolts, 29 Cal.App.2d 699, 85 P.2d 541 (Dist.Co.App. of Calif.1938). In sum, section 1346(b) does not bar any of plaintiff's claims since they arose in 1967 at the time the bridge collapsed.

Terminal Ry. Ass'n v. United States, 182 F.2d 149 (8th Cir. 1950); Perry v. United States, 170 F.2d 844 (6th Cir. 1948); and Oahu Ry. & Land Co. v. United States, 73 F.Supp. 707 (D.Hawaii 1947)—all cases relied upon by the Government—do not compel a different result. In *Oahu* and *Terminal,* plaintiffs sought indemnity from the United States. In each case the claim of the person injured accrued before 1945, but the plaintiff's contribution or indemnity claim apparently accrued after 1944. Even if those claims for indemnity, as such, did not arise at the time of the injury and thus when the underlying claim arose, those cases may at least be distinguished as not involving claims for " * * * money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death * * * " (Emphasis supplied.) 28 U.S.C. § 1346(b). In *Percy, supra,* plaintiff suffered injury as a minor in 1943, but sued in 1947, asserting that no claim had accrued for the period from 1943 to 1947 because he was then under the disability of being a minor. The state statute establishing that disability did so with respect to the state's limitation provision. The Court not only found that statute inapplicable to the determination of when a claim accrued under the FTCA, but further held that that claim accrued in 1943. As already noted, no claim accrued in the within cases until 1967.

The Government argues that rejection of the Government's limitations approach will open the floodgates to stale claims. However, the Tenth Circuit's prior rejection of that view in *Carnes,* the only reported case containing a holding on the issue, stands as mute rebuttal to that argument.

**D. Choice of Law**

Section 1346(b) requires that tort liability be determined " * * * in accordance with the law of the place where the *act or omission* occurred." (Emphasis supplied.) Accordingly, when

mis- or non-feasance takes place in one jurisdiction, and the impact and injury in another, the FTCA compels application of the law of the place of the original act or omission. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). In that case an airplane en route from Oklahoma to New York crashed, allegedly as a result of a negligent act in Oklahoma. In construing section 1346(b)'s choice of law requirement, Mr. Chief Justice Warren (369 U.S. at 9–10, 82 S.Ct. at 591) rejected the contention "that Congress intended the words 'act or omission' to refer to the place where the negligence had its operative effect * * *", and held instead that the statute required

application of the law of the place of the negligent breach. Moreover, *Richards* holds that the law of the place includes that forum's choice of law principles.

■ In this case, plaintiffs urge a path which they contend would slip through choice-of-law problems: they urge that the Silver Bridge disaster was a maritime tort,[11] and that therefore admiralty law applies regardless of what state law is applicable.[12] However, plaintiffs' assertion that admiralty principles govern as to Issue I cannot prevail.[13] Although it is uncertain whether either the alleged negligent acts or omissions and/or the impact and injuries occurred on navigable waters,[14]

11. The application of maritime law in this case would not completely do away with choice-of-law problems since maritime law principles might in turn require resort to, or adoption of, state law. Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960); Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 373–375, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). As to wrongful death statutes in admiralty, *see generally* Moragne v. United States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

12. FTCA suits cannot be brought for tort claims covered by either the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., or the Public Vessels Act, 46 U.S.C. § 781 et seq.; 28 U.S.C. § 2680(d); 46 U.S.C. § 740. None of the negligence alleged in Issue I falls within the purview of either of those Acts.

It seems fairly well settled that apart from the above-noted exception, maritime torts may be asserted under the FTCA. *See* Somerset Seafood Co. v. United States, 193 F.2d 631 (4th Cir. 1951); Ira S. Bushey & Sons, Inc. v. United States, 276 F.Supp. 518, 534 (E.D.N.Y.1967), aff'd on other grounds, 398 F.2d 167 (2d Cir. 1968); Moran v. United States, 102 F.Supp. 275 (D.Conn. 1951). Although the Supreme Court has seemingly not directly considered that question, it has considered other FTCA cases apparently involving maritime torts, *see, e. g.*, Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), and it did not advert to any such barrier in its opinion in Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960), in which it

otherwise thoroughly explored the application of admiralty law in an FTCA case.

13. The same is true as to Issue III. At this time, this Court expresses no views as to the applicability, *vel non*, of admiralty principles as to Issue II.

14. The parties have not disputed that the Ohio River in the area of the Silver Bridge is navigable water. Clearly, the Congress once so considered it, since the Congress found it necessary to authorize construction of a bridge at that locale pursuant to the Bridge Act of 1906 which required congressional consent for interstate bridges over navigable waters. It may be, however, that in the wake of Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), it will now have to be shown that a river is in fact navigable at the time a tort occurs in order for the necessary maritime nexus to exist. *Compare* Adams v. Montana Power Co., 354 F.Supp. 1111 (D.Mont.1973) *with* Madole v. Johnson, 241 F.Supp. 379 (W.D.La.1965). In any event, this Court need not determine whether the Ohio River in 1961, in the area of the Silver Bridge, was navigable in fact, in the light of its conclusion that the necessary maritime nexus is lacking.

Even though the river in that area may have been navigable, it is still uncertain whether the alleged tort occurred in navigable waters. For example, any alleged omission adequately to supervise construction or use of the bridge could arguably be said to have occurred in navigable waters, even if any person allegedly guilty of such negligent omission was not on navigable water at the time he determined not to act. While the parties have stipulated, based on the post-disaster recovery pattern, that all plaintiffs'

nevertheless, even if the tort wholly occurred on navigable waters, there is lacking herein the necessary "maritime nexus" to qualify the same as a maritime tort. *See* Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). In *Executive Jet,* the Supreme Court jettisoned the strict locality test in aviation tort cases, in favor of a maritime nexus test. That case involved property damage (there were no deaths or injuries) caused by the crash of an aircraft into Lake Erie immediately after it took off from a land airport in Cleveland en route to Maine and New York. The Court noted that prior applications of the strict locality test had resulted on occasion in excluding matters obviously maritime and in including matters clearly not maritime. After indicating that past precedents did not absolutely mandate the strict locality rule as the whole or exclusive test, the Court adopted a functional view, holding (at 270–271, 93 S.Ct. 493) that airplane crashes in navigable waters within the continental United States lacked "such a relationship to traditional maritime activity as to justify the invocation of admiralty."

*Executive Jet,* as Chief Judge Haynsworth indicated in Crosson v. Vance, 484 F.2d 840 (4th Cir. 1973), leaves unanswered a number of questions. While in *Executive Jet* the Court did not hold that "maritime nexus" had become the new test for all maritime torts, it certainly appears to have left open to the lower federal courts the possibility of considering the application of that rule to other torts at the borderline. That invitation would seem to have been accepted in, for example, Kelly v. Smith, 485 F.2d 520 (5th Cir. 1973), and Oppen v. Aetna Ins. Co., 485 F.2d 252 (9th Cir. 1973).

In Adams v. Harris County, 452 F.2d 994 (5th Cir. 1971), cert. denied, 406 U. S. 968, 92 S.Ct. 2414, 32 L.Ed.2d 667 (1972), a motorcyclist was hurt when a drawbridge was raised to permit a pleasure vessel to pass. The Fifth Circuit, writing in a pre-*Executive Jet* setting and noting the absence of allegations of negligence by the vesse' held that the tort was not maritime in nature since the negligent acts and the injuries both occurred on an extension of land. In this case, the persons injured were not performing maritime functions or roles; the automobiles and trucks and the bridge were not maritime instrumentalities; nor were the causes—alleged in Issue I—of the injuries maritime, although death or injury may well have been ultimately caused by the impact of hitting the Ohio River or drowning in it. *Cf.* Kelly v. Smith, *supra*; Hark v. Antilles Airboats, Inc., 355 F.Supp. 683 (D.V.I.1973).

Plaintiffs seize upon the Government's position that defendant's sole or primary interest in the Silver Bridge under the Bridge Act of 1906 was an interest in navigation, and further point out that the bridge's collapse had an impact on navigation and commerce in the Ohio River. Whatever might be the defendant's relationship or potential liability to those engaged in navigation or maritime activity, plaintiffs do not fall within that group. If maritime services or industries or pleasure activities were involved, the rules governing conduct and liability that admiralty law has developed to accommodate the peculiar nature of those activities might be appropriate. *See generally* Peytavin v. Gov't Employees Ins. Co., 453 F.2d 1121 (5th Cir. 1972); Chapman v. Grosse Pointe Farms, 385 F.2d 962 (6th Cir. 1967); Higginbotham v. Mobil Oil Corp., 357 F.Supp. 1164 (W.D.La.1973); Rubin v. Power Authority, 356 F.Supp. 1169 (S. D.N.Y.1973). However, since the common law and wrongful death statutes

decedents died in the Ohio River, they have presented no information to this Court that the initial impact or the injuries leading to death occurred in the river. *Cf.* Smith & Son v. Taylor, 276 U.S. 179 (1928), discussed in *Executive Jet, supra* at 255, 93 S. Ct. 493, 34 L.Ed.2d 454.

which supplement it have developed rules of liability particularly appropriate in cases involving death or injuries to users of roadways, overpasses and bridges over non-navigable water, there is little or no need for resort to admiralty principles in a case such as this. *Compare* Crosson v. Vance, *supra, with* Oppen v. Aetna Ins. Co., *supra.*

Even if, in this case, the alleged failures to examine, test, supervise or the like occurred in navigable waters, rather than on the bridge itself, or far away from the bridge such as, for instance, in the District of Columbia, the location of such act or omission may well have been entirely fortuitous. Similarly, if plaintiffs' decedents' injuries did occur in the water rather than on land, that, too, is to some extent the result of chance since parts of the bridge in both of its ends ran over land and since also the break up of the bridge itself could have caused death or injury to a plaintiff on the bridge structure before the plaintiff fell from that structure. Moreover, apart from fortuity, if one but not all elements of the tort in this case occurred in the river, then this case is just the type of case which caused the Supreme Court to jettison the strict locality test in *Executive Jet.* *See* Executive Jet Aviation, Inc. v. City of Cleveland, *supra. See also* Chapman v. Grosse Pointe Farms, *supra.* Thus, the case may be one of the " * * * perverse and casuistic borderline situations that have demonstrated some of the problems with the locality test of maritime tort jurisdiction." *Executive Jet Aviation, Inc., supra* at 255, 93 S.Ct. at 498.

In *Executive Jet,* the Court acknowledged (at 271–272, 93 S.Ct. 249) that a matter might be held to fall within admiralty, if holding otherwise might result in serious problems of choice of law, and quoted (at 272 n. 23), the following passage from 7A J. Moore, Federal Practice, Admiralty ¶ .330[5], p. 3774 (2d ed. 1972):

> * * * Were the maritime law not applicable, it is argued that the recovery would depend upon a confusing consideration of what substantive law to apply, i. e., the law of the forum, the law of the place where each decedent purchased his ticket, the law of the place where the plane took off, or, perhaps, the law of the point of destination. * * *

In the instant situation the failure to apply the substantive principles of admiralty law does result in choice of law problems. However, because the substantive legal principles of each of the jurisdictions whose laws may be applicable herein are not in conflict in their application in this case, those difficult conflicts questions can be largely disregarded. Further, the choice of law problems here are not produced by applying *Executive Jet* to remove from the mantle of admiralty a matter that was once thought to be governed by admiralty law; nor do they result from any gap in federal statutes. Rather, the choice of law problems spring in this case from a choice by the Congress to have the liability of the United States for its torts determinable under the differing laws of the various states. In sum, admiralty principles of law will not be applied herein.

Accordingly, it is necessary to return to *Richards, supra,* to determine what law to apply.[15] In the case at bar, the acts or omissions occurred in two or possibly three locations. With respect to the Secretary of War and the Chief of

---

15. If substantive admiralty law, rather than the substantive law of the States of Ohio and West Virginia were applicable, *see* the discussion *infra*, this Court would then proceed to determine if under admiralty principles the United States violated any duty to plaintiffs' decedents or otherwise incurred any liability to them. Because it holds that admiralty principles are inapplicable, this Court has not fully researched that question. But counsel have not presented, nor has this Court discovered, any reason why such duty or such liability would exist if admiralty principles controlled herein.

Engineers, they probably took place in the District of Columbia. The Secretary's letter to Senator Jones regarding his understanding of the scope of his department's duties under the Bridge Act of 1906, the drafting and sending of Form 92b and the approval of the Bridge Company's application transpired in Washington. The acts or omissions of the District Engineer and his subordinate apparently took place in Ohio and/or West Virginia. Responsibility for the Silver Bridge was assigned to the District Engineer's office in Huntington, West Virginia. The letter from the District Engineer, quoted *supra* at p. 938, to the consulting engineers informing them of the limited scope of the District Engineer's duties apparently was sent from that Huntington, West Virginia office. Nevertheless, with respect to such allegedly omitted acts as further supervision and testing, the acts, had they taken place, would have probably occurred on or near the Silver Bridge, that is, in West Virginia and Ohio. It would appear, therefore, that this Court, pursuant to *Richards*, should look to the law of the State of West Virginia, the State of Ohio or the District of Columbia.

The parties are unable to ascertain the precise locus of the initial impact of the Silver Bridge's collapse on one or more or all of plaintiffs' decedents in relation to the Ohio-West Virginia boundary.[16] The parties have, however, stipulated, based on the recovery pattern of the vehicles, that four of plaintiffs' decedents died on the West Virginia side of the Ohio River, while the remainder died in Ohio.

The District of Columbia has adopted an interest analysis approach to choice of law. Dovell v. Arundel Supply Corp., 361 F.2d 543, 544 (D.C.Cir. 1966); Williams v. Rawlings Truck Lines, 357 F.2d 581 (D.C.Cir. 1965); Tramontana v. S.

A. Empresa de Viacao Aerea Rio Grandense, 350 F.2d 468 (D.C.Cir. 1965), cert. denied, 383 U.S. 493, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966). In *Tramontana*, plaintiff's decedent, a resident of Maryland, was killed in Brazil when defendant's airplane collided with the plane on which Tramontana was traveling. The defendant was a Brazilian corporation having its principal place of business in Brazil, but carrying on activities throughout the world. In deciding to apply Brazilian law on limitation of damages, the Court stated (at 471):

The interest underlying the application of Brazilian law seems to us to outweigh any interest of the District of Columbia. Not only is Brazil the scene of the fatal collision, but Varig is a Brazilian corporation which, as a national airline, is an object of concern in terms of national policy. To Brazil, the success of this enterprise is a matter not only of pride and commercial well-being, but perhaps even of national security. The limitation on recovery against airlines operating in Brazil was enacted in the early days of commercial aviation, no doubt with a view toward protecting what was then, and still is, an infant industry of extraordinary public and national importance. The Brazilian limitation in terms applies only to airplane accidents, unlike the Massachusetts provision rejected in *Kilberg*, which was an across-the-board ceiling on recovery for wrongful death in that state. The focus of Brazilian concern could hardly be clearer. [Footnote omitted.]

The Court then distinguished Kilberg v. Northeast Air Lines, 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961), pointing out that after plaintiff Kilberg, a citizen of New York, boarded defendant's plane in New York, the state in

16. The parties agree that the boundary between Ohio and West Virginia is "the low water mark [of the Ohio River] on the Ohio side at the time the river was in its natural state . . . ." While the parties were unable to determine the exact geographical location of that line, they were able to agree on an acceptable dividing line.

which the injury occurred was fortuitous.

Thus, if District of Columbia law governs herein, the tracking of that analysis leads to application of Ohio and/or West Virginia tort law. Defendant in this case could be said to have its "principal place of business" in the District of Columbia—the locus of the Secretary's and Chief of Engineer's acts and omissions. The actions of defendant's employees have, however, an impact throughout the United States. In *Tramontana*, Brazil legislatively evinced a desire to have Varig's activities governed by Brazilian law. In contrast, Congress foreswore having the tortious acts of government employees measured by a single standard. Rather Congress subjected governmental torts to the standards of various state laws. Herein, West Virginia and Ohio have substantial interests in applying their tort law since the acts predictably impacted within their jurisdictions, and since eight of plaintiffs' decedents resided in Ohio, and four in West Virginia.[17] *See* Roscoe v. Roscoe, 379 F.2d 94 (D.C.Cir.1967); Edmunds v. Edmunds, 353 F.Supp. 287 (D.D.C.1972). *Cf. Tramontana, supra* at 473–475. It would be somewhat difficult to determine whether District of Columbia law would choose to apply West Virginia or Ohio law. Fortunately, there is no need so to select since there seemingly exists no material conflict between the laws of those two jurisdictions with respect to the *liability* issues discussed *infra*.[18]

With respect to the alleged acts and omissions of the District Engineer, West Virginia would apply the law of West Virginia to those of plaintiffs' decedents dying in that state, and Ohio law to those dying in Ohio. West Virginia applies the rule of *lex locus delicti*. Chase v. Greyhound Lines, Inc., 195 S.E.2d 810 (Sup.Ct.App.W.Va.1973); Schade v. Smith, 117 W.Va. 703, 188 S.E. 114 (Sup.Ct.App.W.Va.1936); Dallas v. Whitney, 118 W.Va. 106, 188 S.E. 766 (Sup.Ct.App.W.Va.1936).[19]

Ohio has adopted a form of interest analysis as its choice of law standard in certain personal injury actions, Schiltz v. Meyer, 29 Ohio St.2d 169, 280 N.E.2d 925 (1972); Seeley v. Expert, Inc., 26 Ohio St.2d 61, 269 N.E.2d 121 (1971); Fox v. Morrison Motor Freight, 25 Ohio St.2d 193, 267 N.E.2d 405 (1970), cert. denied, 403 U.S. 931, 91 S.Ct. 2254, 29 L.Ed.2d 710 (1972); *See* Goranson v. Capital Air Lines, Inc., 345 F.2d 750 (6th Cir. 1965), cert. denied, 382 U.S. 984, 86 S.Ct. 560, 15 L.Ed.2d 473 (1966); and apparently would apply Ohio law with respect to plaintiffs' decedents who perished in Ohio and West Virginia law, insofar as liability is concerned, to those dying in West Virginia. Thus, as to liability, West Virginia and Ohio choice of law principles would for differing reasons cause the same substantive law to govern as to each of plaintiffs herein.

### E. Duty under Common Law

As previously noted, plaintiffs premise many of their allegations of negligence on a contention that the Secretary of War, the Chief of Engineers and the District Engineer failed to act with regard to the safety of travelers over the bridge by omitting, for example (1) to consider travelers' safety when approving the submitted plans; (2) to require further submission of plans, sufficient to pass on the bridge's safety for travelers; (3) to consider subsequently the safety of the "I-bar" suspension super-

---

17. The remaining decedent who named the United States as a party defendant was a resident of Tennessee.

18. In the event plaintiffs prevail on liability, it will be necessary, as to each plaintiff separately, or as to all plaintiffs, to choose between Ohio and West Virginia law as to damages.

19. In Dallas v. Whitney, *supra*, defendant blasted in West Virginia, causing damage in Ohio. The West Virginia Court applied Ohio law, holding that when a cause is put in motion in one jurisdiction causing injury in another, West Virginia applies the law of the latter.

structure when, after the grant of approval, the Bridge Company proffered alternative design plans for that superstructure; and (4) to inspect or supervise the bridge for its safety to travelers. For the purposes of summary judgment, this Court will assume to the extent not already so stipulated that defendant did fail to take those actions.

To prevail with respect to those alleged failures, plaintiffs must show that the Bridge Act of 1906 and the subsequent Consent Act imposed a duty running in favor of travelers using the bridge. Negligence is only actionable when injury results from breach of a duty that defendant owes plaintiff. Chadwick v. Air Reduction Co., 239 F. Supp. 247, 249 (N.D.Ohio 1965); Crab Orchard Improvement Co. v. Chesapeake & O. Ry. Co., 33 F.Supp. 580 (S.D.W. Va.), aff'd, 115 F.2d 277 (4th Cir. 1940); Faull v. Abbott, 137 W.Va. 777, 73 S.E.2d 727 (Sup.Ct.App.W.Va.1952); Cooper v. Roose, 151 Ohio St. 316, 85 N.E.2d 545 (1949). *See* Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931). "This duty, to constitute the foundation of an action, may exist by virtue of the pronouncements of the common law, by legislative enactment, by operation of law, by express or implied provision of contract, or may result from the relation to the parties." 39 Ohio Jur.2d § 13 at p. 499.

Absent the Bridge Act of 1906, the United States would not have had any duty to inspect or otherwise approve the bridge plans. Plaintiffs assert, however, that once having undertaken such a course of action pursuant to that statute, the United States is necessarily liable, perhaps as a Good Samaritan, for negligent mis- or non-performance. *See, e. g.*, Indian Towing v. United States, 350 U.S. 61, 64–65, 76 S.Ct. 122, 100 L. Ed. 48 (1955). Voluntarily undertaking to perform a certain course of action, however, does not impose a duty on the actor to perform those or further actions, unless there is an additional factor, *e. g.*, reliance,[20] special knowledge,[21] control [22] or injury caused in some way beyond mere failure to confer the benefit.[23] Without those factors, it

---

20. *See, e. g.*, Briere v. Lathrop Co., 22 Ohio St.2d 166, 258 N.E.2d 597 (1970); Durham v. Warner Elevator Mfg. Co., 166 Ohio St. 31, 139 N.E.2d 10 (1956).

21. *See, e. g.*, Derby v. Public Service Co., 100 N.H. 53, 119 A.2d 335 (1955). *But see* Gowdy v. United States, 412 F.2d 525 (6th Cir. 1969), applying Michigan law, and stating (at 534):

> The mere fact that the Government may have had superior knowledge of safety standards did not increase its duty to exercise ordinary care. The Government was not performing the work, and Gowdy was not under its supervision or control. The District Court did not feel that it was doing anything other than determining the Government's superior knowledge of the danger here involved. 271 F.Supp. at 746. As before stated, the Government owed no duty of inspection and control of the operations of the independent contractor.

22. *See, e. g.*, Cooper v. Roose, 151 Ohio St. 316, 85 N.E.2d 545 (1949); Rogers v. Dietsche, 50 Ohio App. 326, 198 N.E. 194 (1935); Dering v. City of Cleveland, 102 Ohio St. 94, 130 N.E. 504 (1921); Atkinson v. Harman, 151 W.Va. 1025, 158 S.E.2d 169 (Sup.Ct.App.W.Va.1967); Chenoweth v. Set-tle Engineers, 151 W.Va. 830, 156 S.E.2d 297 (1967). The significance of the element of control has been recognized in FTCA cases applying Ohio and West Virginia law, Lemley v. United States, 317 F.Supp. 350 (N.D.W.Va.1970) (West Virginia law); Sayre v. United States, 282 F.Supp. 175 (N.D.Ohio 1967) (Ohio law), as well as other FTCA cases in other jurisdictions. *See, e. g.*, Fisher v. United States, 441 F.2d 1288 (3d Cir. 1973); Ingham v. Eastern Airlines, 373 F.2d 227 (2d Cir. 1967); United States v. Schultetus, 277 F.2d 322 (5th Cir.), cert. denied, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960); Union Trust Co. v. United States, 95 U.S.App.D.C. 189, 221 F.2d 62 (D.C.Cir.), cert. denied, 350 U.S. 911, 76 S. Ct. 192, 100 L.Ed. 799 (1955).

23. For example, in Copeland v. United States, 347 F.Supp. 247 (M.D.Ala.1972), Judge Johnson, after noting that the United States had reserved a right of inspection of a federally-funded low-rent housing project, in order to protect its own fisc, found, in the course of holding the United States not liable, neither the existence of control by, nor reliance on, the United States. *See also* 2 F. Harper & F. James, The Law of Torts § 18.6, pp. 1044–45 (1956).

might even be that if the 1906 Act required the Government to undertake to act specifically for the safety of travelers over the bridge, no liability would flow from nonperformance. *See, e. g.,* Lacey v. United States, 98 F.Supp. 219 (D.Mass.1951).[24]

■ Since this Court holds, as discussed *infra*, that the Government undertook to inspect and approve the Silver Bridge either to protect its own interests or to confer a benefit on a class of persons other than plaintiffs, *e. g.,* persons using the Ohio River for navigation, neither the law of Ohio nor West Virginia, in the absence of the factors of reliance, special knowledge, control or special injury, imposed on the United States the additional duty to inspect and approve for the benefit of persons traveling over the bridge. Lemley v. United States, 317 F.Supp. 350 (N.D.W.Va. 1970), aff'd per curiam, 455 F.2d 522 (4th Cir. 1971), for example, involved a fall from a scaffold causing injury to a construction worker who worked for a contractor under contract to the United States. In its contract with that contractor the United States included detailed safety standards, and reserved to itself the right to inspect the site for compliance with those standards. The District Court found that the United States Government inspector had failed to detect a defective scaffold and that

the plaintiff's injury was attributable to the defective scaffold. Nevertheless the Court held that under West Virginia law the Government was not required to exercise control over the contractor, and that the mere reservation of a right to inspect the work for compliance with the contract terms did not impose a duty to maintain safety conditions running in favor of the employee of the contractor.

Reckman v. Keiter, 109 Ohio App. 81, 164 N.E.2d 448 (Ct.App.1959), illustrates Ohio's application of the same principle. Plaintiff sued a sheriff who failed to ascertain the name of the driver of another vehicle involved in a collision with plaintiff. The Court noted an Ohio statute which required the sheriff to file written reports of collisions with the Ohio Director of Highway Safety, and which also permitted those involved in accidents to receive copies of such reports. In addition, the defendant's deputy specifically assured the plaintiff's passenger that he would secure the other driver's name. The Court held that the statute only imposed on the sheriff a duty to the general public for the purpose of making safer highways. In rejecting the contention that the deputy's statement to the passenger created a duty owed to the plaintiff, the Court adopted from 38 Am.Jur. 666, § 18 the statement that

24. In *Lacey, supra,* plaintiff's decedent sued for negligence by the Coast Guard in rescuing him. Coast Guard regulations provided incentives and punishment with regard to rescue efforts. The Court held, *inter alia,* that although the United States may be liable once it undertakes a rescue, there was not liability in that case, since there was no evidence that other rescuers "rest[ed] on their oars" (at 220) in reliance on the Coast Guard's efforts.

In addition, it should be noted that it may even be that West Virginia law does not impose a duty of reasonable care even if a person volunteers to act and reliance, control or one of the other factors exist. In Fitzgerald v. Chesapeake & O. R. Co., 116 W.Va. 239, 180 S.E. 766 (1935), defendant's employee found plaintiff injured and undertook to aid him. The Court, in the course of its opinion, indicated that a Good Samaritan

may be liable only for gross negligence. The case has not been cited since in West Virginia, and the Good Samaritan question apparently has not been considered again in a reported West Virginia case. If the indication in *Fitzgerald* is good law today, defendant in this case could seemingly not be held liable for any negligence pursuant to Issue I or Issue III to those of plaintiffs' decedents who died in West Virginia on the theory that the United States "volunteered" to inspect and approve the bridge plans. In the light, however, of the discussion in Adkins v. St. Francis Hospital, 149 W.Va. 705, 143 S. E.2d 154, 159, 162 (1965), it may be that the Good Samaritan doctrine would today be recognized by West Virginia. Ohio does recognize the Good Samaritan doctrine. Briere v. Lathrop Co., 22 Ohio St.2d 166, 258 N.E. 2d 597 (Ohio 1970).

* * * [t]he decisions are substantially unanimous to the effect that it is not sufficient to show that the defendant owed to another person or class of persons a duty which, had it been performed, would have prevented the injury of which complaint is made by the plaintiff. This rule applies whether the duty is one imposed by the general principles of the common law or one imposed by statute. * * * [25]

The principle of Ohio law—that one who for his own benefit reserves the right to inspect, investigate or approve is not liable to another for failing to so act—was applied in *Sayre v. United States,* 282 F.Supp. 175 (N.D.Ohio 1967). There the trustee in bankruptcy of an urban renewal project sued under the FTCA claiming "that the defendant United States provided careless and inadequate supervision and inspection of the University-Euclid Urban Renewal Area Project and thereby permitted blight and decay to spread throughout the Hough project area." *Sayre, supra* at 188. The Court held, however, (at 189) that:

> * * * the contract, between the United States Government and the City of Cleveland relating to the University-Euclid Urban Renewal Area Project, *while providing for the right of government inspection of the project, was clearly only intended to benefit the Government* in fulfilling its duty to see that federal funds are properly spent. *This language of the contract imposes no duty of inspection, from which either an owner of property or other private person could derive a private right of action*

*against the Government.* [Emphasis added.]

Ohio does impose liability on one who undertakes to inspect and service an instrumentality and to report to its owner regarding its condition. *Durham v. Warner Elevator Mfg. Co.,* 166 Ohio St. 31, 139 N.E.2d 10 (1956). In such circumstances, the element of reliance and the undertaking to do specific acts for the benefit of an instrumentality's owner led Ohio to find a duty to the owner's employee.[26] But that element and that undertaking are not present herein.

Unless the Bridge Act of 1906 or the Consent Act of 1926 were designed to protect the safety of travelers using the bridge, neither West Virginia nor Ohio law would—simply because the United States undertook to inspect and approve —impose on the United States a duty running to plaintiffs' decedents to inspect and approve the bridge for safety.

### F. Duty under the Federal Statutes

▮ The Federal Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq. requires, *inter alia,* that congressional consent must be obtained for construction of any bridge over navigable waters, and that the Secretary of War and Chief of Engineers must approve plans for any such bridge. The Bridge Act of 1906, 33 U.S.C. § 491 et seq., was subsequently enacted to standardize consent for such bridges:

> The purpose of the bill is to establish uniform regulations in regard to the construction and operation of bridges over navigable waters when hereafter authorized by Congress. A further purpose is to prevent the cumbering up of the statute books by re-

25. *See, e. g.,* Crab Orchard Improvement Co. v. Chesapeake & O. Ry. Co., 33 F.Supp. 580 (S.D.W.Va.), aff'd, 115 F.2d 277 (4th Cir. 1940) ; Cleveland Elec. Illuminating Co. v. Van Benshoten, 120 Ohio St. 438, 166 N.E. 374 (1929) ; Lake Shore & M. S. Ry. Co. v. Liidtke, 69 Ohio St. 384, 69 N.E. 653 (1904) ; Cleveland, A. & C. R. Co. v. Workman, 64 N.E. 582 (Sup.Ct.Ohio 1902) ; Elster v. City of Springfield, 49 Ohio St. 82, 30 N.E. 274 (1892) ; Dungan v. Hart, 107 Ohio App. 431, 159 N.E.2d 903 (1958) ; Sumner v. Lambert, 96 Ohio App. 53, 121 N.E.2d 189 (1953) ; Sheley v. Swing, 65 Ohio App. 109, 29 N.E.2d 364 (1939) ; Sidle v. Baker, 52 Ohio App. 89, 3 N.E.2d 537 (1636) ; Nat'l Carbon Co. v. George, 28 Ohio App. 422, 162 N.E. 785 (1928).

26. *Compare* Taylor v. Continental Cas. Co., 75 Ohio App. 299, 61 N.E.2d 919 (1945).

peating in each bridge bill the same provisions, and also to shorten the time for considering and reading bridge bills in the two Houses of Congress. Under the practice now in force the Committee on Interstate and Foreign Commerce of the House and the Committee on Commerce of the Senate, having jurisdiction of bridge bills, require the insertion in each bill of certain provisions. These provisions make the bill long, take up the time of the two Houses of Congress in the reading of them, and add to the length of the laws when enacted.

The present bill gathers these provisions into one general law, so that hereinafter a bill to authorize the construction of a bridge may be in form similar to the following:

A BILL to authorize John Doe Railroad Company to construct a bridge across the Richard Roe River, at or near Black Acre.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the John Doe Railroad Company, its successors and assigns, be, and they are hereby, authorized to construct, maintain, and operate a bridge across the Richard Roe River, at or near Black Acre, in the State of ——————, in accordance with the provisions of the act entitled "An act to regulate the construction of bridges over navigable waters, approved ——— ———, nineteen hundred and ———." [Regulation of Construction of Bridges over Navigable Waters, Comm. Rep't No. 182, House Comm. on Interstate & Foreign Commerce, 59th Cong., 1st Sess. 1906.]
The 1906 Act provides in part—

* * * [t]hat when, hereafter, authority is granted by Congress to any persons to construct and maintain a bridge across or over any of the navigable waters of the United States, such bridge shall not be built or commenced until the plans and specifications for its construction, together with such drawings of the proposed construction and such map of the proposed location as may be required for a full understanding of the subject, have been submitted to the Secretary of War and Chief of Engineers for their approval, nor until they shall have approved such plans and specifications and the location of such bridge and accessory works; and when the plans for any bridge to be constructed under the provisions of this Act have been approved by the Chief of Engineers and by the Secretary of War it shall not be lawful to deviate from such plans, either before or after completion of the structure, unless the modification of such plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War. [33 U.S.C. § 491, 34 Stat. 85 (1906).]

Section 4 of the Bridge Act, 33 U.S.C. § 494, further empowers the Secretary to require alterations of a bridge under certain circumstances: [27]

That no bridge erected or maintained under the provisions of this Act shall at any time unreasonably obstruct the free navigation of the waters over which it is constructed, and if any bridge erected in accordance with the provisions of this Act shall, in the opinion of the Secretary of War, at any time unreasonably obstruct such navigation, either on ac-

---

27. It is not considered by your committee desirable that the whole authority, as to the location of bridges, shall be turned over to the War Department; but under the pending bill it is provided that when authority to construct a bridge has been granted by Congress the plans and specifications for such bridge, as well as the actual location, shall be submitted to the Secretary of War and the Chief of Engineers and shall be approved by them before the work of construction can begin. The bill reserves to the Secretary of War and the Chief of Engineers the right to order changes to be made in the bridge at any time in the interest of navigation. [House Comm.Rep't, *supra*, at 2.]

count of insufficient height, width of span, or otherwise, or if there be difficulty in passing the draw opening or the drawspan of such bridge by rafts, steamboats, or other water craft, it shall be the duty of the Secretary of War, after giving the parties interested reasonable opportunity to be heard, to notify the persons owning or controlling such bridge to so alter the same as to render navigation through or under it reasonably free, easy, and unobstructed, stating in such notice the changes required to be made, and prescribing in each case a reasonable time in which to make such changes, and if at the end of the time so specified the changes so required have not been made, the persons owning or controlling such bridge shall be deemed guilty of a violation of this Act; and all such alterations shall be made and all such obstructions shall be removed at the expense of the persons owning or operating said bridge. [33 U.S.C. § 494, 33 Stat. 85 (1906).]

The legislation's scope is clearly confined only to bridges over *navigable* waters. While that limitation does not itself negate the possibility that Congress intended to regulate or promote the safety of travelers on bridges, it does at least suggest that congressional concern with federal governmental involvement in bridge construction, as expressed by the 1906 Act, was triggered and existed only if navigational interests also came into play.

In enacting the 1906 Act Congress was expressing an interest both in commerce and in navigation. To balance those interests with regard to bridges spanning navigable waters, Congress retained control over whether a particular bridge could be constructed. "A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land * * *." Clement v.

Metropolitan West Side El. Ry. Co., 123 F. 271, 273 (7th Cir. 1903). Thus, each consent act demonstrates concern for land commerce over and for navigation on navigable waters. That retention of consent by Congress does not indicate, however, any intent to involve the federal government in promoting the interests of such commerce beyond facilitating it by consenting to a bridge's construction.

Section 1 of the 1906 Act, 33 U.S.C. § 491, does not explicitly indicate what factors—navigation, tolls, safety, etc.—the Secretary of War and the Chief of Engineers should take into consideration in approving a bridge, but it does clearly devolve on them a requirement to consider the bridge plans. Some indication of what Congress desired the Secretary to consider, however, may be inferred from Section 4 of the Act, 33 U.S.C. § 494, which permits the Secretary to order alterations of that bridge only if it becomes an obstruction to navigation. *See, e. g.,* United States v. Wauna Toll Bridge Co., 130 F.2d 855 (9th Cir. 1942). The Act further made provisions for safety of navigation, providing that "[t]he persons owning or operating any such bridge shall maintain, at their own expense, such lights and other signals thereon as the Secretary of Commerce and Labor shall prescribe. * * * " 34 Stat. 85 (1906). *See, e. g.,* Southern Ry. Co. v. Tennessee Valley Auth., 223 F.Supp. 1, 8 (E.D.Tenn.1963). It is clear, therefore, that Congress was explicitly concerned with avoiding obstruction to and safeguarding navigation, and provided for considerable governmental power to vouchsafe those interests.[28]

Congress also expressed concern with certain interests of users of bridges over navigable waters. The 1906 Act provides that any bridge built in accordance with that Act shall be a post route, and that no higher tolls may be charged for such use, or for use by the military,

---

28. The Act also provided:
　　* * * If the bridge shall be constructed with a draw, then the draw shall be opened promptly by the persons owning or operating such bridge upon reasonable signal for the passage of boats and other water craft. * * *

than are charged per mile by railroads, streetcars or highways in the area, 33 U.S.C. § 492; that the United States may maintain telephone and telegraph wires across any such bridge, *id.*; that all railroads shall have equal access to any railroad bridge; that the Secretary of War shall determine any rate disputes arising from such use, 33 U.S.C. § 493; and that the Secretary shall regulate the tolls charged for transit over the bridge to " * * * engines, cars, street cars, wagons, carriages, vehicles, animals, foot passengers, or other passengers * * *."

That Congress in consenting to the construction of a bridge over navigable waters had an interest in providing for commerce over such a bridge and that Congress further determined to involve the Federal Government in the regulation and promotion of certain aspects of commerce, does not necessarily mean that Congress also intended to involve the United States in regulating the safety of the bridge for purposes of commerce. Congress specifically commanded the Secretary to prevent material obstruction to navigation and in that connection to provide lights and other specific attributes to promote navigation. Further, the detail with which Congress indicated its intent with respect to certain classes of users of the bridge, *i. e.*, postal, military and railroad, with reference to tolls charged users, and the like, is to be noted. It is thus unlikely that Congress, in enacting the 1906 Act, and the Committee in reporting the Act, would not have been equally explicit with regard to the safety of commerce over the bridge, if there had been an intention to require the Secretary of War to regulate that matter as well. It also appears likely that if Congress had intended to require the Secretary to consider safety in approving the bridges, 33 U.S.C. § 491, it would also have empowered the Secretary to order alterations if

and when safety problems arose. It should be noted in that connection that the Secretary had the power to lower unreasonable tolls as well as to cause alterations as and when required to promote and safeguard navigation. To the contrary, under 33 U.S.C. § 494, neither the Secretary of War nor the Chief of Engineers was expressly given the power to order alterations if a bridge's surface caused users to slip or trip, or if a bridge railing became insufficient or unsteady, or if a problem developed in structural support—unless any of those factors also materially endangered navigation. In sum, it would not appear that the Secretary of War or the Chief of Engineers had either a duty or even a reservation of a right to impose safety standards—apart from navigational safety—on the owners or builders of a bridge subject to the Bridge Act of 1906.

Congress reserved the power to alter the conditions of consent for any or all bridges subject to the 1906 Act in section 8, 33 U.S.C. § 498. As stated by the House Committee Report:

> Of course Congress will have the authority in any special bill to put in special or general provisions, and that may properly be done when there arises some special occasion calling for the exercise of such authority.

Comm.Rep't No. 182, *supra* at p. 2. Accordingly, unless special conditions were imposed, each consent bill merely made the bridge involved subject to the 1906 Act's provisions. The consent bill for the Silver Bridge, however, did include additional provisions permitting the Secretary to audit the cost of construction, and to permit either Ohio or West Virginia to take the bridge by condemnation. Pub.L. No. 221, 44 Stat. 535, 536 §§ 4–6 (1926).[29]

As noted in this opinion, at p. 935, *supra*, S.B. 3499, granting consent to the Silver Bridge, required as a condition:

29. Pub.L.No.221 originally, apparently by inadvertence, referred to Ohio and Kentucky. On December 23, 1926, Congress altered the statute by striking "Kentucky" and inserting "West Virginia".

"That such bridge shall not be constructed or commenced until the plans and specifications thereof shall have been submitted to and approved by the Secretary of War and the Chief of Engineers as being *also satisfactory from the standpoint of the volume and weight of the traffic which will pass over it.*" (Emphasis supplied.) Since the Bridge Act of 1906 was designed to include all but special additional or alternative conditions which Congress could, if it chose, embody in the consent bill applicable to each particular bridge, it would appear likely that the drafters of S.B. 3499 included the above italicized proviso because they believed the 1906 Act would not otherwise have required the Secretary and the Chief Engineer to address themselves to volume and weight of traffic or to the structural validity of the superstructure.

The Secretary of War considered that the Senate bill's proviso added to his department's workload, duties and responsibilities under the 1906 Act. In response to the Senate bill, Dwight Davis, then Secretary of War, wrote Senator Jones, Chairman of the Senate Committee on Commerce as follows:

> I refer to your letter of the 11th instant, requesting my views on S. 3499, Sixty-ninth Congress, First Session, "Granting the consent of Congress to the Gallia County Ohio River Bridge Company and its successors and assigns to construct a bridge across the Ohio River at or near Gallipolis, Ohio."

> So far as the interests of navigation are concerned there appears to be no objection to the bill, but it is deemed proper to invite attention to the proviso in Section 1 requiring consideration of the plans by the Secretary of War and the Chief of Engineers from the standpoint of the volume and weight of the traffic which will pass over the bridge.

> It is understood that this proviso will probably appear in all bridge bills hereafter enacted by Congress. The purpose is presumed to be the giving of added assurance to the public concerning the safety of the structures, and also to insure, so far as possible that they will be planned on a scale likely to be sufficient for the increased traffic of the future.

> The Department does not object to undertaking this work, but it is desired to point out that the proviso will cause great delay and additional expense to applicants in obtaining approval of plans; that it is likely to increase considerably the administration expenses of the Department; will possibly open the door to claims against the United States if approved structures fail and cause destruction of life or property; and that it will not affect the great majority of bridges constructed over navigable waters.

> The last-mentioned feature of the matter arises from the fact that only about one-fifth of the bridges approved by the Department are specially authorized by Congress. The others are approved under consent of State legislatures in accordance with the authority found in Section 9 of the River and Harbor Act of March 3, 1899, and those of this class hereafter approved, will not be subject to the proviso unless existing law is modified.

> Bridges of this class include some of the largest and most costly in the United States, such for example, as the arch bridge crossing the East River at Hall Gate, New York City, and two of the suspension bridges over that river between New York and Brooklyn. Some of the other important waterways which have been or may be bridged on plans approved under authority of State law, are Portland Harbor, No. 1 Boston Harbor, Mass.; New London Harbor, Conn.; Baltimore Harbor, Md.; Norfolk Harbor, Va.; Galveston Harbor, Tex.; San Francisco and the Golden Gate, Calif.; and Puget Sound, Wash.

Congress may and frequently does authorize the construction of bridges over waters, the navigable portions of which are wholly within the limits of a single State. It may be expected to take similar action in the future and it is quite probable therefore that the following will result, of two bridges crossing the same waterway, one constructed under plans approved subject to the proviso in question, and the other constructed on plans approved subject to the provisions of State law. The former will represent a considerably greater cost on account of additional expense due to the checking of its plans and the supervision of construction by Federal authorities, and as far as interest earnings on investment is concerned will be at a disadvantage as compared with the other structure.

The delay and expense that will be caused applicants for approval of plans by the proviso will arise from the fact that applicants must present and the Department must verify, far more information and detailed plans than is now required. Under the practice prevailing hitherto, the Department's examination has ordinarily been confined to the effect of the structure upon commerce and navigation, and the plans submitted by the applicant have been few in number and simple in character, showing only the proposed location and the clearances that will be afforded for the passage of vessels. Under the requirements of the proviso, the Department must first ascertain the volume of land traffic, present and prospective, tributary or likely to be tributary to the bridge, and must then check the sufficiency of all details of the structure before approval can be given. Such proceedings will require in every case, far more time than is now needed to form a conclusion concerning the propriety of giving approval, and it will be realized that in cases such as projects of track line railroads for bridging great rivers like the Ohio and Mississippi, the labor of investigating networks of connecting traffic lines, and the details of huge and intricate steel structures, and massive foundations, will require the assistance of high-salaried experts for an extended period.

The Department must also closely supervise every detail of construction to insure that the plans it approves are properly carried out. Otherwise it will not be in a position to say where the fault lies if failure of the structure occurs.

The probable addition to Department expenditures that will arise from this new procedure cannot now be given. Experience will be needed in order to form an intelligent opinion. The present force of employees is organized to perform only the work Congress has heretofore directed. Judging from the experience of recent years the probable number of bridge applications to be handled under Congressional Acts will average one per week. If the law is modified to require similar procedure in all bridge applications the number of cases will average between four and five per week. The work of investigation and checking will be technical and difficult and in view of the public necessity of prompt action upon applications, of the responsibility that must be accepted in the matter, of the liability that will rest upon the Government if changes in plans directed by its officers are found to be at fault, an adequate corps of thoroughly qualified assistants must be organized. The cost will undoubtedly be great, so great that in my judgment the proviso should receive consideration by the Bureau of the Budget before its adoption.

I wish it understood that the Department is in no way hostile to the plan and will willingly undertake the work. The features of the matter herein set forth are presented simply for the reason that I regard it a duty

to bring forward whatever may be suggested by the experience of the Department as worthy of consideration in embarking upon new responsibilities. In this connection I would also call attention to the fact that failure of bridge structures in the United States is a comparatively rare occurrence. The cost of mistakes in such work and the heavy liability likely to arise if they occur, has been sufficient to cause the exercise of great care by bridge builders both in designing and erecting their structures. Whether similar efficiency will be shown when the Federal Government assumes something of the responsibility, or whether proponents of bridges will rely on the Government to do the costly work of preparing proper designs and plans, remain to be seen.

As noted previously, the final version of the Silver Bridge consent legislation did not contain S.B. 3499's proviso. The parties have stipulated that they do not know of any letter or other communication from any member or committee of Congress responding to Secretary Davis' letter nor of any other discussion in either House—on the floor or in committee—which would cast light on congressional response to the Secretary's letter, or supply further insight into the reason for deletion of the Senate bill's proviso. Were it not for the Secretary's letter, it might be inferable that Congress deleted the proviso as superfluous, that is, as already required by the 1906 Act. Taking into account, however, the Secretary's letter, it seems likely that Congress agreed that the Senate proviso imposed additional duties not otherwise mandated by the 1906 Act on the War Department, and determined that the imposition on that department of the additional burden was undesirable.

Apart from Secretary Davis' letter, the administrative interpretation of the 1906 Bridge Act buttresses the Government's contention in this case that the 1906 Act did not require the Chief of Engineers or the Secretary of War to consider the structural validity or other design aspects from the standpoint of the safety of those features for users of the bridge. In 1916 the Chief of Engineers promulgated a general order dealing with uniformity in maps, plans and drawings and requiring considerable detail in bridge plans with regard to location, height, placement of piers and other matters potentially affecting navigation. The order notes, however, that "[t]he omission from the plans of structural details not needed to illustrate the effect of the proposed bridge *on navigation* is generally preferable." (Emphasis supplied.) Gen'l Order No. 1, War Dep't, Off. of the Chief of Engineers, p. 8, ¶ 29(d) (1916). Form 92b, discussed *supra* at p. 936, revised in 1924, and used in consideration of the application for approval of the Silver Bridge, perpetuated both the requests for considerable detail of matters affecting navigation, and the policy of exclusion quoted above. The Corps of Engineers' interpretation of the requirements of the Act continued unchanged—as demonstrated by the following quote from its 1962 publication, "Permits for Work in Navigable Waters":

> *General policies on issuing permits.* The decision as to whether a permit will be issued must rest primarily upon the effect of the proposed work on navigation. This includes authority to deny any application if a proposed structure obviously is not designed to withstand wave action or other forces and may collapse and create hazards to navigation. The Corps of Engineers cannot effect the location of structures except that permits may be denied if it appears that they will be so located as to unreasonably obstruct navigation. However, in cases where the structure is unobjectionable from the standpoint of navigation but when State or local authorities decline to give their consent to the work, it is not usual for the Corps of Engineers to issue a permit. This is for the reason that since the permit merely expresses assent so far as concerns the public rights of navigation (see

Cummings v. Chicago, 188 U.S. 410), [23 S.Ct. 472, 47 L.Ed. 525] it practically becomes of no value in the event of opposition by State or local authority. In such cases the applicant is informed that the structure is unobjectionable from the standpoint of navigation and that permit would be issued were the consent of the local authority also forthcoming.

* * * * * *

*Plans required.* * * * The location of the work and the essential features covered by the application, particularly the clearances of the navigation opening, will be outlined in red.

* * * * * *

*Special instructions.* * * * Soundings and elevations will be shown in feet and referred to the established Government datum plane at the locality. The direction of current will be indicated by an arrow.

The plans will show in figures the least clear height of the navigation opening from the lowest part of the superstructure to the planes of mean high water and mean low water if the bridge is to cross tidal waters; if the waters are nontidal, to the planes of high water, ordinary high water, and low water; and, if records of river heights are available, to the plane above which flood waters have not remained at any time longer than five consecutive days.

If harbor lines have been established at the site of the bridge, their position will be shown on the plans. Each drawing will have a simple title in the lower right-hand corner.

*Structural details.* Only those will be shown which are needed to illustrate the effect of the proposed structure on navigation. If the bridge is to be equipped with a draw, the draw will be shown in two positions—closed and open. [Corps of Engineers, Dep't of the Army, Permits for Work in Navigable Waters, pp. 2–3 (1962).]

It is to be noted that the Corps is concerned with the structural soundness of the bridge at least insofar as the bridge "obviously is not designed to withstand wave action or other forces and may collapse and create hazards to navigation".

In 1966 the Coast Guard took over the duties of the Corps of Engineers under the Bridge Act of 1906, 49 U.S.C. § 1655(g)(6)(B). The regulations issued by the Coast Guard follow the Corps of Engineers' earlier interpretation of the statute's breadth. 33 C.F.R. § 115.50(i), (j) provide:

(i) *Special instructions.* (1) The scale will be shown graphically. The north and south line will be indicated by a meridian arrow. Soundings and elevations will be shown in feet and referred to the established Government datum plane at the locality.

(2) The direction of currents will be indicated by an arrow, and the strength of currents, both ebb and flow, or low water and high water, will be shown close to the proposed location of the bridge, and at both ends of the waterway shown on the map of location.

(3) The plans will show in figures the least clear height of the lowest part of the superstructure over navigation openings, with reference to the planes of mean high water and mean low water if the bridge is to cross tidal water. If the waters are nontidal, the least clear height will be shown with reference to the planes of extreme high water and mean low water. If records of river heights are available, the plane above which flood waters have not remained more than 2 percent of the time will be indicated. Reference will also be made to other datum planes if appropriate for the waterway in question.

(4) If harbor lines have been established at the site of the bridge, their position will be shown on the plans.

(j) *Structural details.* Only those should be shown which are needed to illustrate the effect of the proposed structure on navigation. If the bridge is to be equipped with a draw,

the latter will be shown in two positions: closed and open.

With regard to bridge alterations 33 C.F.R. §§ 116.05–116.25 provide that the Commandant of the Coast Guard shall investigate all complaints of bridges obstructing navigation, hold hearings if he reasonably believes a bridge obstructs navigation, and if he should decide " * * * that a bridge is an unreasonable obstruction to navigation, he will issue an 'Order to Alter.' " In contrast, 33 C.F.R. § 115.40 on bridge repairs provides:

> Repairs to a bridge which do not alter the clearances, type of structure, or any integral part of the substructure or superstructure or navigation conditions, but which consist only in the replacement of worn or obsolete parts, may, if the bridge is a legally approved structure, be made as routine maintenance without approval of the U.S. Coast Guard.

Interpretations of a statute by the administrative body charged with administering that statute are accorded great weight.

> * * * Certainly courts should hesitate to adopt a construction of the meaning of a regulation in direct conflict with the considered opinion of a specialist who must administer the law pursuant to which the regulation is promulgated. * * *

State Highway Dep't v. The Fort Fetterman, 177 F.Supp. 76 at 80 (E.D.S.C. 1959), aff'd, 278 F.2d 921 (4th Cir. 1960).[30]

Nevertheless, in this day and age the evident interests of the public generally and of individual users in bridge safety might well provide strong and sufficient reason for overturning a settled administrative interpretation—even one as venerable and unambiguous as the one applicable in this case—if the Bridge Act of 1906 and its legislative history were reasonably susceptible of a different reading. In this instance, however, the administrative interpretation is in accord with the apparent intent of Congress; there is no hint anywhere in the Bridge Act of 1906 that the Congress desired the War Department to concern itself with the structural validity of a bridge, except insofar as it affected navigation. Moreover, particularly insofar as the Silver Bridge is concerned, Congress has been on notice of the administrative interpretation of the 1906 Act since at least March 30, 1926 when Secretary Davis wrote Senator Jones regarding S.B. 3499. And yet Congress has permitted the 1906 statute to continue to be administered since 1926 in accord with the 1916 general order, without amendment of the 1906 Act, or without—so far as this Court has been informed—any congressional inquiry into or criticism of the administration of the Act's requirements. That history strongly indicates that the War Department, the Corps of Engineers, and their successors, have correctly interpreted

---

30. *Fetterman* involved the Rivers and Harbors Act of 1899, and not the Bridge Act of 1906. In *Fetterman*, the Fourth Circuit held that a particular design detail was not necessitated by the 1899 Act, which requires only that "plans" be submitted to the Secretary of War, rather than the " * * * plans specifications for its [a bridge's] construction together with such drawings of the proposed contruction and such map of the proposed location as may be required for a full understanding of such bridge * * * " required by the 1906 Act. In deciding that the Bridge Act of 1899 did not call for the detail that was the focus of the litigation, the Fourth Circuit in *Fetterman* relied on the administrative interpretation of the 1899 Act on the one hand, and on the other hand, noted that the 1906 Act would have required the design detail in question. The record in this case discloses, however, that the Corp of Engineers apparently used the same form for bridges subject to the 1906 Act and for those subject to the 1899 Act. *Fetterman* does not conflict with this Court's holding in any way. Whatever additional specificity the 1906 Act requires with regard to details affecting navigation, there is nothing in *Fetterman* to indicate that details of design affecting the safety of commerce over the bridge are commanded by the 1906 Act.

the Congress' intentions as to the statute's scope.

Thus, congressional interest in governmental responsibility for navigation under the bridge and commerce over the bridge was not equal in degree. Nevertheless, any unsafe condition for commerce over the bridge obviously poses a potential threat to navigation, that is, a collapsed bridge obstructs not only commerce but navigation, as would occur when automobiles or carriages go over the side of a bridge as a result of a slippery surface. To some extent the converse might be true as well, since collision of a vessel with a bridge could result in danger to someone on the bridge. It may be, therefore, as a result of the nature of bridges, that as a factual matter, users of a bridge could be incidental beneficiaries of the Government's performance of its duties to navigation, and could also suffer from breach of those duties. That relationship is not automatic, but it is possible. However, even assuming a factual relationship between safe navigation under bridges and commerce over bridges, and also assuming that Congress undoubtedly desires safety in both regards, it is nonetheless evident that in the 1906 Act the Congress imposed upon the executive branch of the federal government only duties relating to safe navigation.

Plaintiffs assert that the holding in United States v. Ingram, 203 F.2d 91 (8th Cir.), cert. denied, 345 U.S. 995, 73 S.Ct. 1136, 97 L.Ed. 1402 (1953), demonstrates that the 1906 Act has a far broader scope. In *Ingram*, the United States sought to enjoin Crittenden County, Arkansas from dismantling part of the superstructure of the Harahan Bridge, which crosses the Mississippi River, connecting Arkansas and Tennessee. The bridge was authorized by an act in 1912, making the bridge subject to the Bridge Act of 1906, and further requiring that the bridge was to " 'be so constructed, maintained, and operated that, in addition to its use for railroad purposes, it shall provide for an adequate and a separate roadway and approaches and continuous use by the public as a highway bridge * * *.' " *Ingram, supra* at 93. The bridge company was given the right to sell the roadway to any local governmental body, in which case the company would " 'be relieved of any requirement to maintain the property so sold * * *.' " *Id.* In accordance with the plans submitted to the War Department the bridge when built included roadways on each side of the railroad tracks. In 1917 the roadways were conveyed to Crittenden County. In 1949 another highway bridge was completed, about 400 feet from the Harahan Bridge, pursuant to congressional authorization granted in 1939. "The new bridge * * * had sufficient capacity to handle all the vehicular traffic which it was anticipated would exist between the two States at this point for many years to come." *Id.* at 94.

The Government opposed the subsequent plan for dismantling the Harahan Bridge, relying in part on the provisions of the 1906 Act, 33 U.S.C. § 491, making it unlawful to deviate from the plans submitted to the Chief of Engineers, "either before or after completion of the structure", without prior approval by the Chief of Engineers and the Secretary of War. The County, however, convinced the District Court that the dismantling was not a deviation since it did not affect the location of the bridge or obstruct navigation. In reversing the District Court, the Eighth Circuit held (at 94–95):

We do not believe that the Act of 1906, 34 Stat. 84, 33 U.S.C.A. § 491 et seq., is entitled to be so construed or applied. It is to be borne in mind that the authorizing, the locating, the constructing, the maintaining, the changing, and the removing of bridges or other structures in navigable streams, as questions of relationship or consequence to navigation, are matters wholly of legislative prerogative and control. See Miller v. Mayor, etc., of City of New York, 109 U.S. 385, 3 S.Ct. 228, 27 L.Ed. 971; Monongahela Bridge Co. v. United States, 216 U.S.

177, 30 S.Ct. 356, 54 L.Ed. 435. There is no right to do any of these things in the navigable waters of the United States, if Congress chooses not to allow them to be done. Within its plenary power of control in this field, Congress may permit or may forbid any or all of them to be done. And since any grant of authority which it so makes is of the nature of a grace or privilege, and not the regulation of a field of private rights, Congress necessarily may impose such limitations or conditions thereon as it sees fit, without relationship to any extraneous concept or test. Cf. United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L. Ed. 243.

Whatever terms Congress has imposed on any granted bridge authority must therefore fundamentally be regarded as matters of legislative policy, having their source and scope in the absolute right of Congress to do anything in this plenary field that it chooses, and not inherently subject to any judicial measuring or checking as a narrow question of navigation obstruction by legal standard. Congress, as we have said, does not have to conform its actions with respect to the building, maintaining, changing or removing of structures in navigable waters to any extraneously appraisable test or standard of navigation obstruction. And no basis can exist for the courts to assume to translate what Congress has done into such a conformation and so to subject the terms of its grant to judicial administration through the question of obstruction— which was what the court did here in considering whether the dismantling would in fact involve or would result in any obstruction to navigation, and in holding on that basis that no ap-

proval of the Secretary of War was necessary as authority for the undertaking—unless the statute contains clear indication of a legislative intent to allow such a judicial intrusion or unless a disabling ambiguity exists in it of such a nature as to compel the intrusion.

Plaintiffs assert that *Ingram* requires a determination in this case that the final specifications for the Silver Bridge's superstructure should have been examined and passed upon by the Secretary of War and the Chief of Engineers, and that the District Engineer, by permitting use of a superstructure plan not approved by the Secretary of War and the Chief of Engineers sanctioned an illegal deviation from the plans approved. Plaintiffs further assert that *Ingram* requires a finding that the 1906 Act created a duty to travelers over the bridge.

But the *Ingram* analogy is of no avail to plaintiffs in this case. The 1912 authorization for the Harahan Bridge, unlike the authorization for the Silver Bridge, specified that the former bridge should include a "separate and adequate roadway". That condition required the Chief of Engineers and the Secretary of War to inspect the Harahan Bridge's plans to make sure that they included the existence of a roadway and that the roadway was "adequate". No such condition appeared in the Silver Bridge's 1926 consent legislation. Additionally, there is no statement in *Ingram* that Congress in requiring the War Department's approval of the bridge superstructure imposed upon that department the duty to inspect for safety.[31] And as to repairs, the Court noted in *Ingram* (at 96 n. 3):

> In the matter of mere repairs, the Department of the Army, Corps of Engineers, has made practicable provision by regulation, as follows: "Re-

31. In *Ingram*, at 94–95, the Eighth Circuit in effect seems to have said that if Congress wants in a given instance to make special provision with regard to its concern with respect to a roadway over a bridge, Congress may so do. But that does not mean that Congress must so do in each instance—and in rejecting the Senate's version of what became the 1926 Act, the Congress did not so do in that instance with respect to bridge safety. *See* n. 31, *infra*.

pairs to a bridge which do not alter the clearances, type of structure, or any integral part of the substructure or superstructure or navigation conditions, but which consist only in the replacement of worn or obsolete parts, may, if the bridge is a legally approved structure, be made as routine maintenance without approval of the Department of the Army." 33 CFR 1949 ed., § 209.315. The situation here, however, is not one of replacing existing parts.

The views expressed in Freeport Texas Co. v. Houston & B. V. Ry. Co., 257 F. 213 (S.D.Tex.1919), aff'd sub nom. Midland Bridge Co. v. Houston & B. V. Ry. Co., 268 F. 931 (5th Cir. 1920), delineating the scope of the Government's duties to approve bridge plans are seemingly totally supportive of the conclusion reached here. The litigation in *Freeport* involved a dispute between a bridge company and its contractor as to liability for the collapse of bridgeworks during construction. The question arose as to whether the federal government had approved, pursuant to the Bridge Act of 1899, 33 U.S.C. § 401, changes in the depth of the bridge foundation and the number of piles to be used—changes which may have led to the structure's collapse. The Court wrote (at 218–219):

* * * It is a hard doctrine that civil contract rights shall be lost

through the failure to submit to the War Department changes in plans when these changes do not affect the location of the structure or its obstructive nature in the stream by enlarging its size or changing its shape, and I cannot believe that the purpose or scope of the act referred to contemplates that the engineers shall pass upon the character and tensile strength of all of the material used in the structure. If the master is right in his view, it seems to me it would be necessary that every change, though involving only the substitution of one kind of cement for another, must be submitted to the War Department, and I cannot think it reasonable to hold that the Board of Engineers of the War Department act as consulting or supervising architects in matters of bridge construction. Their only purpose and obligation is to pass upon the plans for structures in navigable streams to determine their effect upon streams from the standpoint of navigation, and not in any sense for the purpose of determining their structural or architectural efficiency * *.[32]

For the reasons discussed *supra,* this Court concludes that whatever concerns Congress had with respect to commerce, such as providing for bridge travel at a certain location, those concerns did not include the structural safety of the bridge design for travelers

---

[32]. In The Fort Fetterman v. State Highway Dep't, 278 F.2d 921 (4th Cir. 1960) (discussed *supra* at p. 957), it is suggested that if it had been applicable the 1906 Act would have imposed a heavier burden on the War Department as to the draw bridge design therein involved than did the applicable Act in *Fetterman, i. e.,* the 1899 Act. On that basis plaintiffs contend herein that *Fetterman* distinguishes *Freeport.* But *Fetterman,* which was before the Fourth Circuit on three occasions (*see* 278 F.2d at 923 n. 1), did not involve any requirement that the War Department pass on any question of soundness or strength as did *Freeport.*

In *Ingram, supra,* discussing *Freeport Texas Co., supra,* the Eighth Circuit wrote (at 95):

Whether the requirement as to approval which the statute has thus made may have

the burdensome effect of making "the Board of Engineers of the War Department act as consulting or supervising architects in matters of bridge construction", as is suggested in Freeport Texas Co. v. Houston & B. V. Ry. Co., D.C.S.D. Tex., 257 F. 213, 218, 219, affirmed sub nom. Midland Bridge Co. v. Houston & B. V. Ry. Co., 5 Cir., 268 F. 931, we do not deem a matter of judicial concern. * * * [Footnote omitted.]

In other words, the Congress could as it did in connection with the Harahan Bridge impose additional duties on the War Department regardless of the extra work and responsibility entailed, if the Congress so desired. The point in the case at bar is that the Congress evidently did not so desire.

over the bridge. The Secretary of War, the Chief of Engineers, and the District Engineer were placed under no such duty, as a matter of federal law, by the Congress. As to West Virginia and Ohio law, the case law illustrated by Lemley v. United States, *supra*, Sayre v. United States, *supra*, and the other cases discussed earlier in this opinion, shows that, under the laws of those States, the United States owed no such duty to travelers. Indeed, the within case presents additional factual reasons for so holding not present in those cases. In this case, plaintiffs, unlike plaintiffs in *Lemley*, attempt to assert that the Government owed a duty to perform additional acts beyond those which the Government had reserved to itself the right to perform and for which the Government had not developed standards. As indicated in the Secretary of War's letter, performing the actions which plaintiffs herein allege defendant should have performed would apparently have required the Government to have engaged additional staff, and might have involved substantial delay in approval of the bridge plans. While not determinative, those factors nevertheless carry weight at least when no other policies of the common law or statutory law call for imposition of such a burden.

### G.  *Special Factors*

At pp. 947–948 *supra,* the factors of reliance, special knowledge, control, and injury caused in some way beyond the mere failure to confer the benefit, are adverted to as potential underpinnings for the imposition of a duty upon the United States. No claim of reliance can be meritoriously asserted herein. There is no indication anyone traveled over the bridge because he believed that the *War Department*, as opposed to others such as consulting engineers, had inspected the bridge design.[33] Nor did the Corps of Engineers have any special knowledge about the Silver Bridge plans which it had a duty to divulge to the builder, to the consulting engineers, or to anyone else. Further, the Corps, by the duties it performed with regard to design approval, did not adversely affect the construction or safety of the bridge.

In cases involving plane crashes resulting from the negligent acts or omissions of air controllers, over whom it possessed or exercised control, the United States has been held liable. *See, e. g.,* Ingham v. Eastern Air Lines, 373 F.2d 227 (2d Cir. 1967); Union Trust Co. v. United States, 113 F.Supp. 80 (D.D.C. 1953), aff'd in part as to United States, 221 F.2d 62 (D.C.Cir.), cert. denied, 350 U.S. 911, 76 S.Ct. 192, 100 L.Ed. 799 (1955). In *Union Trust,* an FTCA case, the District Court, in discussing the scope of governmental activity, quoted from a non-FTCA case, Northwest Airlines v. Minnesota, 322 U.S. 292, 303, 64 S.Ct. 950, 88 L.Ed. 1283 (1944), as follows (113 F.Supp. at 82):

> Congress has recognized the natural responsibility for regulating air commerce. Federal control is intensive and exclusive. Planes do not wander

---

33. If the Bridge Company, on the other hand, had erected the superstructure in the belief that the War Department had inspected the design and determined that it was safe, such reliance might perhaps furnish a basis of liability to the Bridge Company. *Cf.* Rogers v. Dietsche, 50 Ohio App. 326, 198 N.E. 194 (1935). But in this case, as previously noted, the District Engineer wrote the Bridge Company's consulting engineers that approval of superstructure design was unnecessary, and called to their attention the absence from the consent act of the provision in the Senate bill requiring the Corps of Engineers to consider the adequacy of the bridge "from the standpoint of the weight and traffic that will pass over it". Additionally, even if there had been no such letter, it is unlikely that liability could be imposed upon the Government even in favor of the Bridge Company in the absence of a reasonable basis for reliance. Further, even if there had been a representation upon which plaintiffs relied, the question remains whether they could predicate a claim based on such reliance under the FTCA. 28 U.S. C. § 2680(h). *See* United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961).

about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. *It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders.* * * * Its privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government.

(Emphasis supplied by *Union Trust.*) Such control of bridges by the United States similarly might create a duty to commerce over the bridge. *Cf.* Rayonier Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957). In Sayre v. United States, *supra,* the Court noted (282 F.Supp. at 189):

> The limitations of the Government's right of inspection are evident. It has the right of inspection but the correction of any noncompliances must be dealt with through the local public agency. Specifically, the Government is forbidden from issuing any orders or instructions to contractors on the job. * * *

Also, in Lemley v. United States, *supra,* the Court impliedly recognized that control furnished a basis for liability, but stated that under the facts of that case, reservation of a right to inspect did not constitute control (317 F.Supp. at 360–361):

> * * * The Government retained an inspector on the premises to insure

that the building would be of the quality contracted for, however, it is very clear that the inspector had no right or authority under the contract to direct or supervise the performance of the work of the contract, and at no time did the inspector exercise such authority.

*See also* Fisher v. United States, 441 F. 2d 1288 (3d Cir. 1971); Lipka v. United States, 369 F.2d 288 (2d Cir. 1966).[34]

United States v. Ingram, discussed *supra* at pp. 958–960, establishes that Congress may, when it so desires, exercise full control of a bridge over navigable waters. *See also* Nassau Electric Co. v. Riegelmann, 123 Misc. 3, 205 N.Y.S. 81 (Sup.Ct.1924), aff'd, 212 App. Div. 883, 208 N.Y.S. 906 (1925), in which the Court in a brief opinion enjoined the Borough of Brooklyn from paving over a railroad bridge to Coney Island. One of the bases for the holding was that Brooklyn was required first to seek approval from the Chief of Engineers. Neither *Ingram* nor *Nassau* nor any other case indicates, however, that Congress by the 1906 Act preempted, with regard to each bridge over navigable water subject to that Act, control of safety features.

In City of Benwood v. Interstate Bridge Co., 30 F.Supp. 952 (N.D.W.Va. 1940), the Court required a bridge company to abide by conditions imposed upon it by the City. That case dealt with the Interstate Bridge Company which was formed in 1921 or 1922 to build and operate a bridge from Benwood, West Virginia to Bellaire, Ohio. Late in 1922 Benwood passed an ordinance [35] which in 1923 defendant's

34. *Cf.* Chenoweth v. Settle Engineers, 151 W.Va. 830, 156 S.E.2d 297 (1967); Cooper v. Roose, 85 N.E.2d 545 (Sup.Ct.Ohio 1949).

35. That ordinance included among other provisions the following:
Sec. 3. The right to construct, maintain and operate said bridge over Eighth Street, and its approaches is subject to the condition that said bridge company shall repave said Eighth Street with brick

from the Ohio River to Ninth and Marshall Streets in a substantial manner, the same to have a concrete base of at least eight inches; * * * and shall be maintained during the life of this ordinance by the said bridge company. The City of Benwood further reserves the right to name the mode and methods of constructing said street.
Sec. 4. It is further provided that the north railing of said bridge shall be solid

board of directors voted to accept. In 1924 the Congress consented to construction of the bridge subject to the provisions of the 1906 Act. The bridge was subsequently constructed pursuant to plans approved by the United States, which plans however did not comply with the ordinance. The Court (at 956) rejected the defendant's contention that replacing an open railing with a closed one would constitute an illegal deviation from the plans approved by the United States, holding that such change was too minor. With respect to the other conditions of the ordinance, the Court characterized defendant's position (at 957) as follows:

> \* \* \* It [the bridge company] seeks to adopt the legal position that this bridge could have been built in its present location and according to the plans actually followed without ever obtaining any consent whatever from the City of Benwood, the Company asserting that the Act of Congress gives it the right to construct the bridge and the approaches thereto in accordance with the plans approved by the Secretary of War, and that the City of Benwood would have been powerless to do anything about it. It was asserted in argument, and repeated in the brief for the Bridge Company, that the ordinance was only accepted, and at least partially complied with, in order to retain the good will of the citizens of Benwood.
>
> Under the construction of law for which the Company contends, it would be possible for Congress, by authorizing a sufficient number of interstate bridges, to completely block and render useless every street in every city bordering upon a navigable stream. The mere assertion of such a doctrine demonstrates its absurdity. However,

in this case the point need not be judicially determined, because, irrespective of any obligation to obtain the consent of the City of Benwood, the Company did, in fact, obtain such consent in the form of an ordinance. \* \* \*

Benwood illustrates that the 1906 Act does not preempt all control to the federal government.[36]

The United States has not assumed such control over the Silver Bridge by virtue of the Bridge Act of 1906 and the consent act of 1926 that it owed a duty to commerce to inspect and approve the bridge for safety. First, and most important, the federal government issued no directive to and exercised no supervision over the formulation of the plans by the Bridge Company and its consulting engineers and contractor. Compare Rogers v. Dietsche, 50 Ohio App. 326, 198 N.E. 194 (1935). All that the federal government did, prior to construction, as has been emphasized supra, was to approve the bridge design from the point of view of navigation. As to the post-construction period, 33 U.S.C. § 494 authorizes the Secretary to initiate and to order alterations if the bridge obstructs navigation. As to alterations not relating to navigation, 33 U.S.C. § 491 authorizes the Secretary to approve deviations. There was no federal statutory provision which prevented the Bridge Company or its successor as owner, the State of West Virginia, from making alterations for any reason, so long as those alterations were first approved by the Secretary if they constituted deviations. In sum, the responsibility for action as to planning, building, operating and maintaining the Silver Bridge was not within the control of the federal government; rather the latter only possessed certain veto pow-

---

from the west track of the Baltimore and Ohio Railroad to the east bank of the Ohio River. The floor shall be constructed of concrete or some other material such as will prevent the accumulation and blowing of dust and dirt. The said bridge company shall also build two stairways

leading from the ground to the floor of said bridge \* \* \*. [City of Benwood v. Interstate Bridge Co., supra, 30 F.Supp. at 955.]

36. See also the Coast Guard pamphlet quoted from at p. 952 supra.

ers. Unless and until the United States assumes control over an aspect of an instrumentality of interstate commerce, the state or states involved retain authority over the same. *See* South Carolina State Highway Dep't v. Barnwell Bros., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938). This would seemingly be particularly true with regard to the feature of safety. Indeed, the States of West Virginia and Ohio apparently did enact legislation relating to safety of bridges and highways which seemingly was applicable to the Silver Bridge before its collapse. A West Virginia statute, enacted prior to the construction of the Silver Bridge, provides for investigation of any toll bridge complained of as unsafe by the road engineer or supervisor of the county court. W.Va.Code Ann. § 17–17–6.[37] Ohio, after the Silver Bridge was built, passed even more comprehensive statutes regarding bridges, which call for, among other things, inspection and repair of bridges over interstate navigable waters.[38] In sum,

---

37. § 17–17–6. Unsafe toll bridge.

Whenever complaint is made to the county court of any county wherein a toll bridge is, that the same is not in a safe condition, it shall order its road engineer or supervisor to inspect the same and report his investigation, and if, after considering such report, the court be of opinion that the bridge is in an unsafe or dangerous condition, it shall make its finding a matter of record, and cause its clerk to certify a copy thereof to the public service commission for action thereon. It shall be the duty of said commission, upon the receipt of such certified record, to summon the corporation or person owning the bridge, or collecting tolls therefrom, to appear before it and make answer respecting such finding, whereupon the commission shall take such action and make such orders respecting such bridge as it may deem just. In case it is determined by the commission, upon such hearing, that the bridge is unsafe for travel, it shall prohibit the further collection of toll thereon until the same is placed in such condition as may be ordered or directed by the commission.

38. Among the various Ohio provisions regarding bridges are the following:
§ 5593.03 Construction and acquisition of bridges.

The state bridge commission and any county or city bridge commission may:

(A) Construct, acquire by purchase or condemnation, and improve, operate, and maintain bridges entirely within the state or such county or city, *or over rivers and navigable waters which form a boundary of the state, or such county or city,* notwithstanding that the waters of such river or *navigable water* may not at all times extend to or reach said boundary line, whenever the bridge, any part thereof, or the approach facilities thereto will extend within the boundary of the state or of such county or city;

(B) Pay the costs of such construction, acquisition, improvement, operation, and maintenance  *  *  *. [Emphasis added.]
§ 5501.47 Responsibility for bridge inspection.

(A) The director of *transportation* is responsible for inspection of all bridges on the state highway system inside and outside of municipalities, all bridges connecting Ohio with another state for which the department *of transportation* has inspection authority, and all other bridges or portions of bridges for which responsibility for inspection is by law or agreement assigned to the department.

Such inspection shall be made annually by a professional engineer or other qualified person under the supervision of a professional engineer, or more frequently if required by the director, in accordance with the manual of bridge inspection described in division (B) of this section.

(B) To co-operate with the federal government in the establishment, construction, reconstruction, improvement, maintenance, and repair of post roads and other roads designated by the federal authorities;

(C) To conduct research and to co-operate with organizations conducting research in matters pertaining to highway design, construction, maintenance, material, safety, and traffic;

(D) To co-operate with the counties, municipal corporations, townships, and other subdivisions of the state in the establishment, construction, reconstruction, maintenance, repair, and improvement of the public roads and bridges. [Emphasis in original.]
§ 5591.42 Carrying capacity of bridges; warning notice. (GC § 7572)

The board of county commissioners together with the county engineer or an engineer to be selected by such board, or the director of highways, may ascertain the safe carrying capacity of the bridges on

the degree of control in this case is more akin to the construction cases such as *Lemley, supra,* and other cases such as *Sayre, supra,* than it is to the group of air controller cases.[39]

### H. *Breach of Statutory Duty*

■ As already noted, after approval of the plans, the consulting engineers wrote the District Engineer informing him of their plan to use a different superstructure design. The District Engineer at no time required the final plans of the superstructure to be submitted to the Government, but instead informed the consulting engineers that they did not need to be submitted since they did not affect navigation. The District Engineer thus permitted the bridge to be built in deviation from the approved plans and in violation of the Secretary's

> roads or highways under their jurisdiction. Where the safe carrying capacity of any such bridge is ascertained and found to be less than the load limit prescribed by sections 5577.01 to 5577.12, inclusive, of the Revised Code, warning notice shall be conspicuously painted in large letters near each end of such bridge. Such notice shall caution all persons against driving on the bridge a loaded conveyance of greater weight than the carrying capacity thereof, or more than twenty head of horses or cattle at any one time.

39. It may be that even if the United States had the same indicia of control as an occupier or owner of the bridge, that it would nonetheless be held harmless in the instant case. In Chinca v. United States, 190 F. Supp. 643 (N.D.Cal.1961), plaintiff was injured when he fell through the rotten planking of a bridge in a national forest owned by the United States. The Court first noted (at 644) that plaintiff was a licensee, " * * * having lawfully come upon defendant's land for a non-business purpose of benefit only to himself * * *." Thereafter, the Court noted (at 644) :

> Defendant has admitted that the bridge in question suffered flood damage in December, 1955, and that defendant's agents knew of said damage and the resulting unsuitability of the bridge for use. But maintaining an unsafe bridge is clearly not active conduct; it is rather a condition of the premises, which a licensee must take as he finds them. * * *

The Court held for defendant on the basis that an owner of a bridge owes licensees the

duty under the 1906 Act to approve the final plans. *See* United States v. Norfolk-Berkley Bridge Corp., 29 F.2d 115, 121 (E.D.Va.1928) (Soper, J.). That breach of statutory duty, however, is of no avail to plaintiffs because the duty not to violate the statute was one that was not owing to them.

It will advance the cause of neither of the parties to show that the other was violating the command of some legal requirement unless he can connect that requirement with himself or his cause. If he rests his case upon the violation of some duty, he must show that the duty is owed to him; else his cause is lost at the outset.

Sidle v. Baker, 52 Ohio App. 89, 3 N.E. 2d 537 at 540 (1936). *See* Peigh v. Baltimore & O. R. Co., 92 U.S.App.D.C. 198, 204 F.2d 391, 393 (1953).[40]

duty only to refrain from active misconduct.

As to the status of, and duties owed to, licensees under West Virginia and Ohio law, *see* Wellman v. Christian, 147 W.Va. 189, 126 S.E.2d 375, 379 (1962) ("[m]ere permissive use of the premises, by express or implied authority, ordinarily creates a license") ; Soles v. Ohio Edison Co., 144 Ohio St. 373, 59 N.E.2d 138 (1945) ; Brown v. Rechel, 108 Ohio App. 347, 161 N.E.2d 638 (1959) ; Niebes v. Crestline Aerie No. 859, 94 Ohio App. 21, 114 N.E.2d 260 (1952) ; Kucia v. National Tube Co., 23 Ohio App. 453, 155 N.E. 171 (1925). *But see* W. Prosser, Law of Torts § 60, p. 390 n. 11 (3d ed. 1964). *See also* Piggott v. United States, 498 F.2d 1397, (4th Cir. 1974).

40. In Sheley v. Swing, 65 Ohio App. 109, 29 N.E.2d 364 (1939), plaintiff alleged that his house burned down because the fire trucks were unable to cross a bridge that was in disrepair. By virtue of an Ohio statute then in force, the board of county commissions was " * * * liable in its official capacity for damages received by reason of its negligence or carelessness in not keeping any * * * road or bridge [under the control of the board] in proper repair * * *." The defendant had breached its statutory duty to keep the road repaired. The Court stated (at 366) :

> * * * Until a person proceeds to use the road, he does not bring himself in relation to the county in such a way as to cause the duty to become active for his protection. * * *
> Now the plaintiff was not traveling upon this highway. The members of the Groes-

The precise question seemingly has not been decided by West Virginia's highest Court.[41] However, there is little reason to doubt that West Virginia, adhering as it does to an approach on the strict side with regard to the need for privity in tort cases, see Williams v. Chrysler Corp., 148 W.Va. 655, 137 S.E. 2d 225 (1964), discussed in Shanklin v. Allis-Chalmers Mfg. Co., 383 F.2d 819 (4th Cir. 1967), would not reach the same results as have the Ohio courts, particularly in the light of the conformity of those results to generally accepted tort standards. See W. Prosser, The Law of Torts § 36, pp. 192–95 (4th ed. 1971); Restatement (Second) of Torts § 286 (1965).

## I. Nuisance

Plaintiffs also contend that the United States, by permitting the bridge to be built in deviation from the approved plans in violation of the 1906 statute, created a public nuisance under W.Va. Code Ann. § 17–17–4. That statute provides, in part:

Every bridge across the Ohio river hereafter erected or commenced, wholly or in part within the jurisdiction of this State, contrary to the provisions of the two next preceding sections [§§ 17–17–2, 17–17–3], and every railroad bridge across the Great Kanawha or Big Sandy river hereafter erected or commenced, wholly or in part within the jurisdiction of the State, contrary to the provisions of said sections, shall be deemed a public nuisance, and, so far as the same is within the said jurisdiction, may be abated and the construction thereof prevented and enjoined by presentment, indictment, or bill in equity in the name of the State or other remedy appropriate to the case; and it shall be the duty of the attorney general, as well as of the prosecuting attorney of the proper county, to cause proper proceedings to be instituted and prosecuted to abate, prevent and enjoin such work, as soon as they shall be credibly informed that the same has been or is about to be commenced. * * *

Of the two sections referred to in section 17–17–4, both of which have been in force since 1852, one of them, section 17–17–3, is not pertinent to this case. That section refers to the power of bridge corporations to borrow money, mortgage or encumber the bridge. Section 17–17–2, however, provides in part:

Corporations may be formed under the provisions of chapter thirty-one [§ 31–1–1 et seq.] of this Code for the purpose of bridging the Ohio river.

---

beck fire department were, but no injury was suffered by them. They are not parties to this action. * * *

In Sheley, therefore, the duty imposed by statute was to travelers, and not to house owners whose dwellings were on fire; thus, its breach did not create a duty to a member of that latter class. Accord, Dunn v. Brammer, 102 Ohio App. 89, 141 N.E.2d 193 (1956).

Lake Shore & M. S. Ry. Co. v. Liidtke, 69 Ohio St. 384, 69 N.E. 653 (1904), involved an ordinance requiring railroads to fence their rights-of-way; plaintiff, a young boy, slipped through the fence and was injured. The Supreme Court of Ohio held that the ordinance only created a duty on defendant's part to fence out cattle, and therefore breach of that duty did not create a right in plaintiff.

In Dungan v. Hart, 107 Ohio App. 431, 159 N.E.2d 903 (1958), defendant breached Ohio's "fencing" statute, and as a result, plaintiff was injured when his car hit defendant's cow. The Court held (at 905): " * * * The violation of a statute, to constitute negligence, requires the showing that the obligation imposed was for the benefit of the person alleging injury. * * * " Since Ohio's fencing statute was for the protection of adjoining landowners from trespass, the plaintiff could not base his action on defendant's breach of the statute.

See also Sumner v. Lambert, 96 Ohio App. 53, 121 N.E.2d 189, 194 (1953); cf. Cleveland Electric Illuminating Co. v. Benshoten, 120 Ohio St. 438, 166 N.E. 374 (1929).

41. But see Crab Orchard Improvement Co. v. Chesapeake & O. Ry. Co., 33 F.Supp. 580, 583 (S.D.W.Va.), aff'd, 115 F.2d 277 (4th Cir. 1940), in which the Court, applying West Virginia law, held that a duty to an employee not to injure him did not give rise to a duty to the employer to avoid injury to his employee.

Any such corporation or any railroad corporation is hereby authorized to construct and maintain a bridge across said river in the manner now, or which may hereinafter be, provided by the Congress of the United States, upon complying with the requirements, conditions and provisions so prescribed, and not otherwise * * *.

■ Plaintiffs contend that they have a private cause of action for nuisance against the United States under section 17–17–4 because the United States wrongfully allowed the bridge to be constructed other than in a manner "provided by the Congress". The United States may be liable for tort under 28 U.S.C. § 1346(b) whether the claim is based upon common law or state statute.[42] Even if it is assumed *arguendo* that 17–17–4 confers a private right of action,[43] it does not create such a cause of action against anyone other than a bridge corporation.[44] It may be, however, that under the common law of West Virginia some persons other than a bridge company who are involved in the erection of a bridge may be liable for sufficiently participating, along with a bridge company, in the creation of a nuisance as defined by 17–17–4. *See, e. g.*, Flanagan v. Gregory & Poole, 136 W.Va. 554, 67 S.E.2d 865 (Sup.Ct.App. W.Va.1951). But before West Virginia would impose liability on such a person, that person would first have to owe a duty to the plaintiffs. As has been discussed, *supra,* in sections F–H, inclusive,

the involvement of the United States was not such as to give rise to a duty to travelers on the bridge. That the action here may be for nuisance as well as negligence does not change the result. Nuisance "has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion." W. Prosser, Law of Torts § 87, p. 573 (4th ed. 1971) (footnote omitted). Without privity, control, reliance or any of the other factors reviewed, *supra,* West Virginia common law does not impose a duty upon the United States, for nuisance any more than it does for negligence.[45]

■ It is possible that a further barrier exists to plaintiffs' maintaining a nuisance action which barrier does not exist herein with regard to negligence. Strict liability, *i. e.,* liability without fault, may not be imposed upon the United States under section 1346(b). Laird v. Nelms, 406 U.S. 794, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972), reaffirming the holding in that respect of Dalehite v. United States, *supra.* Section 17–17–4 would not appear to require any wrongful or negligent action as a predicate either for the West Virginia Attorney General successfully to abate the nuisance or for a private person to assert damage claims. In this instance, however, plaintiffs have seemingly alleged both a negligent and a wrongful act, *i. e.,* that the District Engineer allowed deviation from the approved plans in violation of the 1906 Act. Nevertheless, the presence of strict liability in

---

42. In American Exchange Bank v. United States, 257 F.2d 938, 940 (7th Cir. 1958), the Court noted that the Wisconsin Safe Place Statute set a standard of care pursuant to which the plaintiff therein was given a cause of action against a certain class of private persons and that the United States, when it performed functions which brought it within that class, could be held liable under section 1346(b).

43. *Cf.* Wilson v. Phoenix Powder Mfg. Co., 40 W.Va. 413, 21 S.E. 1035 (1895).

44. This Court has not been referred to, nor has it discovered, any case in which the statute has been construed.

45. As to plaintiffs who died in Ohio, Ohio might recognize that violation of the West Virginia statute constituted a nuisance and proceed to determine the existence, *vel non,* of duty under the common law of Ohio rather than of West Virginia. *See* the discussion *supra* at p. 946. However, Ohio would also require the existence of a duty before imposing liability for nuisance. *See* Perrysburg Banking Co. v. Village of Deshler, 11 Ohio App. 158 (Ct.App.1919).

17–17–4 may itself be a barrier to plaintiffs herein, if 17–17–4 can only be applied in its totality. *See* Konsler v. United States, 288 F.Supp. 895 (N.D.Ill. 1968), and the cases discussed therein.

"There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.' It has meant all things to all men, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie. There is general agreement that it is incapable of any exact or comprehensive definition. * * * " W. Prosser, Law of Torts § 86, p. 571 (4th ed. 1971) (footnotes omitted). The law of West Virginia as to nuisance seemingly often requires a case-by-case approach as West Virginia's highest court has indicated in Harless v. Workman, 145 W.Va. 266, 114 S.E.2d 548, 552, 555–556 (1960). *See also* Mayes v. Union Carbide, 143 W.Va. 336, 101 S.E.2d 864 (1958); Flanagan v. Gregory & Poole, *supra*. But herein the nuances of nuisance need not detain us. For whether the tort be one of negligence, or nuisance created with or without negligence or other wrongful act, no plaintiff can recover damages for a tort from a person unless that latter person violated a duty owed to the plaintiff. "Nuisance", as Professor Prosser has written (at 577, 4th ed. 1971), " * * * is not a separate tort in itself, subject to rules of its own. Nuisances are types of damage—the invasion of two quite unrelated kinds of interests,[46] by conduct which is tortious because it falls into the usual categories of tort liability." (Footnotes omitted.)

## J. *Discretion*

If, contrary to this Court's holdings *supra*, the FTCA does impose any duty herein upon the United States, there would still be the need for plaintiffs to bring these cases without the "discretionary" exception provided in the FTCA. Section 2680(a) of 28 U.S.C. states that the FTCA's waiver of immunity shall not extend to—

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

In Dalehite v. United States, *supra*, the Court held that "operational" activities were without the scope of the exception, while "planning" activities fell within. Mr. Justice Frankfurter, writing for the Court in Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1951), rejected any implication in *Dalehite* that the discretionary exception imported the "uniquely governmental activity" concept into the FTCA, *id.* at 65–67, 76 S.Ct. 122; *see* Rayonier, Inc. v. United States, 352 U.S. 315, 319, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), and further seemingly questioned the correctness of Dalehite's results on the facts. *Id.* at 69 n.4, 76 S. Ct. 122. Mr. Justice Frankfurter in no way, however, undercut *Dalehite's* dichotomy between operational and planning activities.

In the wake of *Indian Towing*, the federal courts have recognized that not every choice is discretionary.[47] Nonetheless, when an official is authorized to weigh potentially conflicting considerations in arriving at a decision,

---

**46.** Those protected against public nuisance on the one hand and those protected against private nuisance on the other hand. Herein a public nuisance is involved. *See* Prosser, *supra* at § 86 et seq.

**47.** *See, e. g.*, Ingham v. Eastern Air Lines, 373 F.2d 227, 228 (2d Cir. 1967); American Exchange Bank v. United States, 257 F.2d 938 (7th Cir. 1958); Dahlstrom v. United States, 228 F.2d 819 (8th Cir. 1956); Jemison v. The Duplex, 163 F.Supp. 947 (S.D.Ala.1958); Bulloch v. United States, 133 F.Supp. 885 (D.Utah 1955).

such decisions fall squarely within the discretionary exception. Thus, in Coastwise Packet v. United States, 398 F.2d 77 (1st Cir. 1968), plaintiff sued for damages resulting from alleged heel-dragging by the Coast Guard in granting a certificate of inspection to plaintiff's vessel. Chief Judge Aldrich held defendant's actions within the discretionary exception, stating (at 79):

> Plaintiff's is not a case where there was a single, known, objective standard which, because of administrative negligence, the Coast Guard failed to apply. In such an area there might be questions. When no standard exists, then the process of certifying, insofar as it involves groping for a standard, is within the discretionary exemption of the Act.

In Mahler v. United States, 306 F.2d 713 (3d Cir.), cert. denied, 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962), the plaintiff alleged that the Secretary of Commerce had negligently approved the design of a federal-aid highway. Chief Judge Biggs noted (at 722) that section 12 of the Federal Aid Highway Act of 1938, 52 Stat. 636, provides:

> Hereafter the Secretary of Agriculture shall approve only such methods of bidding and such plans and specifications of highway construction for the type or types proposed as will be effective in securing competition and conducive to safety, durability, and economy of maintenance. (Emphasis deleted.)[48]

Relying on *Dalehite*, Chief Judge Biggs held (at 723–724):

> \* \* \* The determination by the Secretary of Commerce to approve the plans and specifications for the Penn-Lincoln project, the decision which initiated the federal government's financial participation, was obviously a pol-

icy judgment of the type most important to the success of the federal-aid highway program. It is administrative action requiring the conscious weighing of such factors as location and anticipation of future traffic flow. The same must be said of federal guidance during the pre-approval design stage. As such, we think that these decisions fall on the planning side of the planning-operational distinction drawn in the Dalehite case, subsequently adopted and approved in Eastern Airlines, Inc. v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62, 76–77 (D.C.Cir.), aff'd per curiam sub nom. United States v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L. Ed. 799 (1955). [Footnote omitted.]

*Accord,* Daniel v. United States, 426 F. 2d 281 (5th Cir. 1970); Delgadillo v. Ellidge, 337 F.Supp. 827 (E.D.Ark. 1972).

■ In this case, the activities, or lack thereof, of the Secretary of War and the Chief of Engineers, are within the discretionary exception, since those actions were at the "planning" and not the "operational" level. Daniel v. United States, *supra.* Assuming, *arguendo,* that the Secretary of War and Chief of Engineers did have a duty to consider both the safety of commerce over and navigation under the bridge, they undoubtedly had discretion in determining the nature, details, extent and volume of the plans, specifications and drawings which they required "for a full understanding of the subject" and the relationship of the same to expense factors.[49] If so, to the extent those factors might conflict, even if the Secretary should give safety little or no weight and approve a design on the basis of the weight of other factors such as cost, he would be acting within the discretionary

---

48. In the 1952 Code, such section seemingly appeared as section 8a, and among other changes, substituted the Secretary of Commerce for the Secretary of Agriculture.

49. By providing in the consent bill for audit by the Secretary of the Silver Bridge's con-

struction, and by providing for condemnation by Ohio or West Virginia, Congress may have been expressing an interest in making it economically feasible for those states to acquire the Silver Bridge. *See also* United States v. Ingram, *supra.*

exemption of the FTCA. *See* Miller v. Mayor of City of New York, 109 U.S. 385, 393–394, 3 S.Ct. 228, 27 L.Ed. 971 (1883) (Field, J.); Daniel v. United States, *supra.*[50] If the Secretary and the Chief of Engineers by addressing themselves only to navigational interests were wrong, and if this Court is wrong in believing they were right in so doing, there will remain the question of whether, even if they thus abused their discretion, their abuse would not still be within the discretionary exemption.[51]

■■■ With respect to the District Engineer, the Government acknowledges that the Bridge Act of 1906 made deviation from approved plans unlawful, but contends that the District Engineer had the right to approve minor deviations. That contention would not appear to be tenable. United States v. Norfolk-Berkley Bridge Co., 29 F.2d 115, at 121–122 (E.D.Va.1928). *Cf.* Bulloch v. United States, 133 F.Supp. 885 (D.Utah 1955); Pennsylvania R. Co. v. United States, 124 F.Supp. 52 (D.N.J.1954). If therefore the District Engineer wrongfully or negligently permitted erection of the bridge in deviation from the approved design, such an act would not fall within the discretionary exemption contained in 28 U.S.C. § 2680(a) on the grounds that the deviation was minor even if it is assumed that the deviation was minor. *See* American Exchange Bank v. United States, *supra* at 941. In sum, the discretionary exception is not applicable herein at least with respect to the District Engineer. However, because the United States violated no duty to any of plaintiffs' decedents with respect to Issue I, the motion for summary judgment of the United States as to that Issue is hereby granted.

### ISSUE II

■■■ During the years between 1926 and 1967 there were a number of federal governmental activities in and along the banks of the Ohio and Kanawha Rivers which plaintiffs allege caused the Silver Bridge tragedy. Those allegations present factually controverted issues which require trial. Accordingly, defendant's motion for summary judgment is denied insofar as that motion relates to Issue II.

### ISSUE III

In June 1951 the Ohio State Automobile Association passed a resolution which reads in part:

Ohio River Bridges.

The Ohio River presents a barrier to the free movement of traffic to and from the eastern states, particularly between Ohio and the States of West Virginia and Kentucky, and it is, therefore, essential that the bridges over the Ohio River connecting the important highway links be adequate to carry the traffic to which they are subjected.

The great increase in highway travel since these bridges were built and which has been greatly increased due to our national defense program, finds these bridges inadequate in varying degrees to carry the traffic to which they are subjected. Many of these bridges are in a questionable state of repair so that in this time of emergency, traffic is greatly impeded and hampered.

The Ohio State Automobile Association hereby requests the Director of Highways of the State of Ohio, with appropriate highway officials of the States of West Virginia and Kentucky, to forthwith initiate a survey of the situation regarding the inadequacy of the bridges across the Ohio River. It is further suggested that the officials of the three states involved request the Corps of Army Engineers charged with the responsibility of riv-

50. *See also* Sisley v. United States, 202 F. Supp. 273 (D.Alaska 1962); Boyce v. United States, 93 F.Supp. 866 (S.D.Iowa 1950). *Cf.* United States v. Ingram, *supra.*

51. *Cf.* Coastwise Packet Co. v. United States, *supra,* 398 F.2d at 79.

er and harbor improvement to join with them in making an over-all survey of the existing conditions of the bridges in order to determine what steps are necessary to provide adequate facilities to meet our present and future transportation needs, and this with regard to river transportation and probable high water stages of the Ohio River.

Subsequently, the Director of the Ohio Highway Department wrote to the District Engineer, Bureau of Public Roads, Department of Commerce, as follows:

On January 4, 1952 I attended a meeting in Cincinnati with the State Highway Officials of Kentucky and West Virginia. The subject matter discussed was the adequacy of the existing Ohio River crossings. It was agreed that the three states would cooperate in a detailed study of the existing structures and we were of the unanimous opinion that the Bureau of Public Roads should participate. I therefore, request, as will the other two states that you attend the scheduled meeting as set forth in minutes.

On February 15, 1952, a meeting was held in Ashland, Kentucky attended by, among others, two federal officials of the Bureau of Public Roads. Approximately one month later Ohio submitted a request for financial assistance from the Federal Bureau of Public Roads in a letter dated March 17, 1952:

This department, in conjunction with the Kentucky Department of Highways and the West Virginia State Road Commission, plans to undertake an engineering needs survey of all Ohio River highway crossings between East Liverpool and Cincinnati.

The Planning Survey sections of the respective states will be responsible for collecting and analyzing vehicle volumes, classification and origin-destination data applicable to traffic using the crossings. Wherever practical, traffic records obtained as part of recently made municipal or rural surveys will be re-analyzed and adjusted to a 1952 level. Where no survey information exists, it is planned to operate interview stations in much the same manner rural origin-destination stations are operated.

The Ohio Planning Survey will schedule field operations at seven bridges. It is estimated that such coverage will entail a total of two weeks work at a cost of approximately $2,000.00. Coding and analysis operations will amount to an estimated $1,500.00.

The Kentucky and West Virginia Planning Surveys will be responsible for either obtaining new survey records, or re-analyzing past records, relative to the remaining 14 structures and the four ferry crossings.

Inasmuch as the procedure involved in this river crossing survey augments, and will be correlated with, the continuing traffic study phase of the Planning Survey's program, the State recommends it be carried as a participating federal-state item, 4(a) and 4(F), of approved Project No. HPS 1(11). I shall appreciate your advising me if this meets with the approval of the Bureau.

In January 1955, completed reports of the study were sent by Ohio to the District Engineer of the federal bureau. That study included the following statement about the Silver Bridge (at V1–F): "Since a new floor was placed and structural repairs made in 1941, this bridge is capable of carrying an H–15 loading." The phrase "H–15 loading" apparently means that the Silver Bridge's capacity for traffic was equivalent to that of new bridges. The District Engineer did not read the report, but instead merely forwarded it to the Regional Office of the Federal Highway Administration (hereinafter "FHA").

In this case, the parties have stipulated:

* * * [A] registered professional engineer employed by the plaintiffs in this action, concluded, among other

things, that the design and construction of the eyebar chains of the Silver Bridge were such that two very dangerous elements were brought together, i. e., extremely high tensile stresses, and (2) corrosion of the inside of the eyebar head under the pin, producing a crack in the head of eyebar at Joint 13 which eventually totally cracked the bottom part of the eyebar and caused the total collapse of the bridge * * *.

There is no evidence that the participants in the Ohio River Bridge Survey made any examination of the stresses in the eyebar chain of the Silver Bridge, although such an examination would have disclosed the low factors of safety used in the original construction of the Silver Bridge.

At least one of the brittle fractures found by the investigators following the collapse of the bridge was so deep that original paint was inside that fracture * * *. There is no evidence that the structural steel of the Silver Bridge was inspected for cracks during the Ohio River Crossings Survey conducted in 1952–1953.

When published the 1952–53 study's cover included upon it the legend: "State of West Virginia State Road Commission"; "State of Ohio Department of Highways"; "Commonwealth of Kentucky Department of Highways"; and "U. S. Department of Commerce Bureau of Public Roads". The study's "Foreword" indicates that it consists of engineering reports on the "traffic, approach capacity and structural capacity" of each bridge studied. It then stated: "This entire series of reports should provide highway engineers with an effective means of properly evaluating all structures with respect to overall adequacy, sufficiency and traffic service." Although the report reveals a number of studies of traffic volume and of origin and destination of vehicles using the bridge, nothing in the report indicates any examination of the structure of the Silver Bridge, except for the above-quot-ed statement regarding flooring and capacity, and nothing in the report suggests that any field tests of the structure were performed.

On the basis of that history, plaintiffs assert the following allegations:

The United States Bureau of Public Roads was negligent and careless in its participation in the study and in its evaluation and representations of the capabilities and capacities of the Silver Bridge in that the Bureau of Public Roads knew or should have known that the bridge was vulnerable to a sudden collapse due to its unique eyebar construction, the stress corrosion and corrosion fatigue factors which can produce cracking in the eyebar steel, the absence of any special corrosion protection, the collection of water adjacent to points of high stress in an eyebar chain, the high vibration of the bridge, the greatly increased traffic loads, and other factors which impaired and reduced the safety of this bridge for members of the traveling public. The Bureau of Public Roads failed to adequately inspect the bridge in connection with the survey in which it participated, did not alert the officials of the States of West Virginia and Ohio to the dangers of this bridge and failed to warn the public, including plaintiffs' decedents, of the dangers and risks involved in using the highway over this bridge, when such dangers and risks were known or should have been known to the Bureau of Public Roads.

The parties dispute whether the study was intended to cover the structural integrity of the bridges surveyed. Excerpts and characterizations of deposition testimony submitted by plaintiffs indicate that the surveys of structural integrity were intended to be part of the study with respect to at least some bridges. In the context of defendant's motion, it is assumed for that purpose only that structural sufficiency was an intended part of the survey with regard to the Silver Bridge but that no study of

structural sufficiency of the Silver Bridge was performed. The parties also disagree as to the scope of the federal Bureau's involvement in the study. It is undisputed however that the Bureau attended at least one of the meetings at which the proposed scope of the entire Ohio River Crossings Survey was discussed, that the Bureau received a proposed budget for that survey, that the Bureau funded, at least in part, the study, and that the Bureau received a copy of the final report. It is further agreed that the District Engineer of the federal Bureau did not evaluate the final report. Moreover, as indicated above, the parties have stipulated that neither the United States nor the three States involved in the study examined or tested the Silver Bridge for stresses or fractures. Plaintiffs have neither alleged, nor proffered any evidence to prove, that the United States was involved in any way in the gathering, compilation, analyses of the data or writing of the report, or represented or indicated to the three state agencies that it would so involve itself. Nevertheless, this Court will assume, in the current summary judgment posture of this case, that the United States did so involve itself.

The Ohio River Crossings Survey was seemingly undertaken pursuant to 23 U. S.C. § 21 (1952) of the Federal Highway Act.[52] That section provides in relevant part:

> So much, not to exceed 3-¾ per centum, of all moneys appropriated or authorized to be appropriated for expenditure under the provisions of sections 1, 2, 3, 3a, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15–20, 21, 22, 23, and 25 of this title and section 3 of Title 50, as the Secretary of Commerce may deem necessary for administering the provisions of said sections and *for carrying on necessary highway research and investigational studies independently*

*or in cooperation with the State highway departments and other research agencies, and for publishing the results thereof,* shall be deducted therefrom for such purposes when the apportionment is made * * *. [Emphasis supplied.]

The section bestows upon the Secretary of Commerce the discretionary authority to determine whether a given study shall be undertaken, and if so, to what extent the resources of the Bureau of Public Roads and federal funds shall be committed. Assuming, *arguendo,* that the project as originally planned and approved did involve structural study of the Silver Bridge, and assuming that either by decision or otherwise, such a structural study did not take place, 23 U.S.C. § 21 did not bind the Secretary to inspect the Silver Bridge or to have that bridge inspected by others, either initially or after the study was commenced. Under the Federal Highway Act generally, the principal involvement of the United States is monetary, while the burden for action is upon the states. *See, e. g.,* 23 U.S.C. § 6 (1952). State highway departments designate certain road systems as either primary or secondary federal-aid highways, subject to the Secretary's approval. Federal funds are then disbursed for construction or reconstruction of such highways according to an apportionment formula based on such designation. 23 U.S.C. § 6. The states then submit projects for proposed construction or reconstruction which require funding, 23 U.S.C. § 12 (1952); after approval of the project, 23 U.S.C. § 21a (1952), the actual work is then undertaken by the state highway departments. 23 U.S.C. § 13 (1952). The duty of maintaining federal-aid highways resides with the states, 23 U. S.C. § 48 (1952); and the Federal Commissioner of Public Roads has a duty to cut off funds if a state does not so per-

---

52. There may also be one or more other sections of that statute pursuant to which the study may have been made. But analysis of the entire statute indicates that under none of its sections was any duty imposed upon the Secretary running in favor of plaintiffs. Further, in any event, the Secretary's actions or omissions fall within the discretionary exception of the FTCA.

form its maintenance duty. 23 U.S.C. § 15 (1952). Each state can obtain funds for the entire engineering costs of surveys, plans, specifications and estimates of construction of roads important to the national defense if the Secretary approves. 23 U.S.C. § 21c (1952).

■ The United States' level of participation in studies authorized by 23 U.S.C. § 21 (1952) was sometimes greater than it was in connection with the Ohio River Crossings Survey. The parties have stipulated:

> During the period 1948–1970, the FHA conducted, directly or in participation with State highway departments, extensive field tests on numerous bridges throughout the United States * * *, but no such field test was ever conducted on the Silver Bridge * * *.

> For many years the FHA conducted, directly or in participation with State highway departments through leading universities and research institutions, many projects dealing with research in matters of bridge safety. * * *

The discretionary grant of authority to the Secretary of Commerce to have studies made enables him to submit annual reports in connection with the same to the Congress, 23 U.S.C. § 20a (1952), and, subject to annual appropriations by the Congress, to determine the amount, priority and apportionment of federal funds for federal-aid highways, 23 U.S. C. §§ 6, 6a–1, 20a (1952). In that context, a survey such as the Ohio River Crossings Survey is most relevant in connection with state applications for federal funds to replace or reconstruct a bridge like the Silver Bridge, or to construct an additional bridge, 23 U.S.C. §§ 6, 9a, 9a–1, 12 (1952). Moreover, studies such as those provided for by section 21 may include research that produces innovations—cost-saving or otherwise—in highway projects built with federal funds. Whether or not the protection of the federal fisc or future efficient use of federal funds is the sole or exclusive

rationale for 23 U.S.C. § 21 (1952) or of any of the other provisions of the FHA, there is no indication that the Congress intended by passage of the FHA to impose upon the Secretary of Commerce, or any other federal official, the duty to provide for safety of commerce over the Silver Bridge or over any other bridge or highway.

In Mahler v. United States, 306 F.2d 713 (3d Cir. 1962), plaintiffs, injured on a federal-aid highway, contended (at 715):

> * * * that the United States failed to fulfill its duty in three respects: first, by causing to be approved by the Secretary of Commerce defective plans for the project submitted to it by the Pennsylvania Department of Highways pursuant to 23 U.S.C. § 12 and by participating in planning conferences held during the preparation of the defective plans; second, by failing to discover faulty construction by inspections carried out by the Bureau of Public Roads pursuant to 23 U.S.C. § 13; and third and last, by failing to provide for and make inspections after construction was completed which, according to the allegations of the complaint as amended, would have revealed defective maintenance by the Commonwealth of Pennsylvania. The last point is bottomed upon the periodic maintenance inspections conducted by the Bureau of Public Roads. See 23 U.S.C. §§ 15, 48 and Bureau of Public Roads Policy and Procedure Memorandum 21–11.1.

In *Mahler*, the automobile in which plaintiffs were passengers ran into a large boulder that had fallen onto an interstate parkway in the State of Pennsylvania. Chief Judge Biggs stated (at 715) that " * * * [t]he United States approaches the problem * * * by making the correct primary assertion that there can be no liability in tort in Pennsylvania, as elsewhere, unless a defendant is guilty of a breach of some legal duty owed by him to the plaintiff." After considering the legislative history

of the Federal Highway Act in great detail, Chief Judge Biggs concluded (at 721):

> * * * that in enacting the provisions respecting approval and inspection by the federal government, it was not the intention of Congress to. impose a duty on the Secretary of Commerce, on the Bureau of Public Roads, or on the United States or any of its agencies, to make sure that a member of the travelling public, a user of a federal-aid highway, was not injured because of negligence in carrying out these provisions. The concern of Congress was to make sure that federal funds were effectively employed and not wasted. [Footnote omitted.]

With respect to inspections of federal-aid highways pursuant to 23 U.S.C. §§ 13, 15, 48, the Court thus concluded that the Secretary of Commerce was required to inspect only to safeguard the federal fisc. With respect to the provisions of 23 U.S.C. § 12,[53] providing for approval of design of proposed highways, however, Chief Judge Biggs apparently concluded that since that section required, among other things, that the Secretary consider safety, that it would appear either under the Federal Highway Act or under Pennsylvania law that the Secretary had breached a duty to the plaintiff. The Court went on, however, to decide that the latter duty was not actionable since it fell within the discretionary exception to the FTCA.[54]

Unlike the inspections pursuant to sections 13, 15 and 48 considered in *Mahler*, the Secretary may inspect for reasons other than protection of the fisc, although that consideration is an ever-present factor. On the other hand, section 21, as opposed to section 12 considered in *Mahler*, does not direct the Secretary specifically to consider safety. The language of section 21 empowers the Secretary to undertake highway research. Such research might include safety or any number of other purposes, *e. g.*, whether a bridge or highway is wide enough to accommodate present and future traffic, or whether various materials used provide optimum durability and minimum maintenance at a reasonable cost. Even if an inspection is undertaken with respect to considerations of safety, it might include only the behavior of bridge roadway surfaces under a variety of weather conditions. In sum section 21 does not require the Secretary to make any inspection of any particular road or bridge or if he does make such inspection, to inspect for safety, or when such inspection is for safety, to consider structural integrity.

In *Mahler*, the Court determined (at 722) that Pennsylvania would not impose liability for inspections pursuant to 23 U.S.C. §§ 13, 15, 48 under the case of Bollin v. Elevator Construction & Repair Co., 361 Pa. 7, 63 A.2d 19 (1949), but did not decide (at 723) whether Pennsylvania would, pursuant to *Bollin*, impose liability for inspection of construction plans under 23 U.S.C. § 12. In *Bollin* the plaintiff sued for injuries suffered when an elevator the plaintiff was employed to operate collapsed while he was performing his employment. A third-party defendant, the insurance company for the defendant, the owner of the building in which the plaintiff worked, had undertaken as part of its insurance contract with the building owner to inspect the elevator. Pennsylvania law provided that if an elevator is insured by a company authorized so to insure in Pennsylvania, each inspection of that elevator by the insurer shall be reported to a governmental department and that the latter shall issue a certificate of operation to be posted in the elevator itself. The Pennsylvania statute further provided that no elevator could be lawfully operated without having posted within it such a certificate. The Court held the insurer liable to the insured's employee on the ground that when the insurer assumed the responsibility to inspect and report to the city,

---

53. Quoted at p. 969 *supra*.

54. Discussed *supra* at p. 968 et seq.

that assumption gave rise to a duty to the general public not to inspect negligently.

■ It may be that Ohio would impose liability in circumstances similar to *Bollin*.[55] The *Bollin* case, however, would seem inapplicable if the right of inspection is retained for the benefit of the one inspecting,[56] and if there is also no direct control over the conditions inspected.[57] In that respect, the instant case is similar to Lemley v. United States, *supra*, discussed at p. 948, and Sayre v. United States, *supra*, discussed at pp. 948–949 *supra*. In those FTCA cases supplying West Virginia law in the former and Ohio law in the latter, the United States had reserved rights of inspection and approval for its own purposes. In both, the Courts held that the United States did not assume any liability to a member of the public. It should be noted that in *Lemley* the United States specifically undertook to inspect for safety, and that the inspection in *Sayre*, while not for safety, was specifically designated. By contrast, the Secretary's powers under 23 U.S.C. § 21 covered the whole range of "highway research" and certainly did not require highway safety to be part of any or all such research. Further, in both *Sayre* and *Lemley* the United States could not directly order correction of the matters it was inspecting, even though it did have recourse to other courses of action. Similarly, the Secretary of Commerce did not have the power under the FHA or in connection with the Ohio River Crossings Survey to require the State of West Virginia or the State of Ohio to fix any defect in the Silver Bridge, although the Secretary might have had the power to cut the funds for those states if they had not repaired it, 23 U. S.C. § 15 (1952), and might have been able to supply funds for such repair if the state involved desired to undertake the same. 23 U.S.C. §§ 9, 9a–1 (1952). In sum, the Secretary did not have control over the Silver Bridge; accordingly, neither Ohio nor West Virginia law imposes upon him the type of liability asserted by plaintiffs under Issue III.[58]

■■ Plaintiffs also contend that because the United States knew that the bridge had a unique design, and because it was aware of technical studies of matters such as the effect of stress and corrosion on bridges, the United States therefore had a duty to inspect. This Court knows of no law in Ohio or West Virginia that requires one who is neither an owner nor controller of an instrumentality to undertake to inspect or warn of its dangers if that person has not made a promise to inspect or warn, and if that person has not made a statement, or committed an act or omission, which has created in favor of another the right to rely upon such statement, act or omission. *See* 2 F. Harper and F. James, The Law of Torts § 18.6 (1956).

■ In sum, this Court holds that under the Federal Highway Act and the law of West Virginia and Ohio, the

55. In a case factually similar to *Bollin*, Taylor v. Continental Cas. Co., 75 Ohio App. 299, 61 N.E.2d 919 (1945), an Ohio Court of Appeals held that no liability flowed to the insurer. However, in Durham v. Warner Elevator Mfg. Co., 166 Ohio St. 31, 139 N.E.2d 10 (1956), the Court held an elevator company liable to the employee of the elevator's owner for negligent inspection which the defendant had contractually undertaken to perform. In so doing, the Court cited *Bollin*. *Durham, supra* at 15.

56. *See* the discussion of Reckman v. Keiter, *supra*, and other Ohio and West Virginia cases cited at p. 948 of this opinion in connection with inspection under Issue I.

57. *See* Chenoweth v. Settle Engineers, 151 W.Va. 830, 156 S.E.2d 297 (Sup.Ct.App.W. Va.1967) ; *cf.* Cooper v. Roose, 151 Ohio St. 316, 85 N.E.2d 545 (Sup.Ct.Ohio 1949).

58. It is noted that after the Silver Bridge collapsed, the United States participated in the investigation and determination of the causes of collapse; but that participation is not in the least indicative that there existed upon the United States any duty to inspect prior to the tragedy. *See* Cooper v. Roose, *supra*.

United States had no duty to inspect the Silver Bridge for structural stresses or fractures, or to warn the public that the Silver Bridge was dangerous, simply because of the involvement of the United States in the Ohio River Crossings Survey or because of any other activity of the United States in connection with Silver Bridge's status as part of any federal-aid highway program.

██ Plaintiffs point out that the Bureau of Public Roads permitted the Ohio River Crossings Survey to be published with the federal government's name upon its cover and with the inclusion in the survey of the above-and below-quoted language, namely: "Since a new floor was placed and structural repairs made in 1941, this bridge is capable of carrying an H–15 loading". However, even if that language is assumed *arguendo* to constitute an actionable representation of safety of the Silver Bridge by the United States upon which representation members of the public using the Silver Bridge had a right to rely, the complaints herein, to the extent they rest upon the same, are barred by that provision of the Federal Torts Claims Act, 28 U.S.C. § 2680(b) which makes that Act inapplicable to "[a]ny claim arising out of * * * [*inter alia*] misrepresentation * * *." United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1295 (1961).

██ Plaintiffs additionally contend that the United States breached a duty it owed the States of West Virginia and Ohio because the federal Bureau of Public Roads did not alert the public to the dangers of the Silver Bridge. There is nothing in the record to indicate that the Bureau of Public Roads ever stated to any official of the States of West Virginia or Ohio that the United States had evaluated the Silver Bridge and had concluded that the capabilities and capacity of that bridge were adequate or inadequate, safe or otherwise. Nor is there anything to indicate that West Virginia or Ohio lacked understanding

of the limited extent of involvement of the United States. Further, there is no indication that any of the officials of those states thought the United States had examined or undertaken to examine the Silver Bridge. Indeed, plaintiffs have not otherwise contended herein. Thus, this is not a case in which the United States is a person who caused liability by starting to do more than he had to do and then stopping before completing the undertaking. *See* Briere v. Lathrop Co., 22 Ohio St.2d 166, 258 N. E.2d 597 (1970). But plaintiffs also assert that the United States was aware that the Silver Bridge had a unique eye-bar design and that corrosion, vibration and other factors could have an impact on eye-bar steel. Nevertheless, plaintiffs have not alleged—indeed they could not meritoriously so allege—that those facts were in the exclusive control of the United States. An exhibit submitted by plaintiffs shows that the uniqueness of the Silver Bridge's design was publicly known as early as June 20, 1929, when an article appeared (at p. 997) in *Engineering News-Record*. The editor's note and the first paragraph of that article both reveal that the Silver Bridge's use of heat-treated eye-bar chains was a first. With respect to the effects of corrosion and stress upon a bridge so constructed, there is a dispute as to whether such effects were sufficiently known, understood and appreciated at the time the Ohio River Crossings Survey was undertaken and completed. But assuming, as this Court must in the summary judgment posture of this case, that, as plaintiffs assert, those effects were sufficiently known, understood and appreciated in 1952 or any time thereafter prior to the collapse of the Silver Bridge, there is no indication that the United States was the sole possessor of that knowledge. Nor is there any indication that the officials of the States of West Virginia or Ohio were relying on the United States to impart such knowledge to them, or that either or both of such states requested technical informa-

tion or assistance from the federal Bureau of Public Roads. It follows that the United States did not owe or breach any duty to either of the States of West Virginia or Ohio. Accordingly, it is not necessary for this Court to reach the question of whether, if there was a breach by the United States of any such duty to either or both of those states, the same would furnish any basis for liability of the United States to plaintiffs.

■ Defendant asserts that even if the Bureau of Public Roads did owe any duties to inspect the Silver Bridge or owe any other duties with respect to undertaking examination of the Silver Bridge at any time, defendant is protected by the discretionary exception to the FTCA. As noted previously, in Mahler v. United States, *supra,* the Court held that the Secretary's responsibility to inspect and approve plans for highway construction under the Federal Highway Act, 23 U.S.C. § 12, was discretionary. That Court so concluded, even though safety was one of the factors that Congress directed the Secretary to consider. Chief Judge Biggs noted that when Congress delegates to an employee of the United States the responsibility to weigh potentially conflicting factors, any decision made on the basis of those factors falls within the discretionary exception. *Mahler* was followed by the Fifth Circuit in another Federal Highway Act case in Daniel v. United States, 426 F.2d 281 (5th Cir. 1970), and also by Judge Oren Harris in Delgadillo v. Ellidge, 337 F.Supp. 827 (E.D.Ark. 1972). *See also* Sisley v. United States, 202 F.Supp. 273 (D.Alaska 1962).[59] The discretion afforded the Secretary of Commerce under 23 U.S.C. § 21 is still greater than under section 12. Section 21 of 23 U.S.C. (1952) left it to the Secretary of Commerce to decide whether the Bureau of Public Roads would undertake any study of any bridge and further provided that if the Secretary did so affirmatively decide, the Secretary had the authority to decide both the scope of that study and of the United States' involvement, if any, in that study, both with regard to funding and participation. Any such decision would have been a planning, rather than an operational, decision. Although Dalehite v. United States, *supra,* may, as indicated *supra* at p. 968, have been narrowed by Indian Towing v. United States, *supra,* the discretionary exception as interpreted by such subsequent cases as *Mahler, supra, Daniel, supra,* and Coastwise Packet v. United States, *supra,* leaves room within that exception for its application to plaintiff's claims under Issue III herein. Accordingly, this Court holds that any acts and/or omissions which the United States is alleged to have committed in connection with Issue III fall within the scope of the discretionary exception to the FTCA. 28 U.S.C. § 2680(a).

Because the United States violated no duty to plaintiffs' decedents as to Issue III and also because of the applicability of the discretionary exemption as to that Issue, the motion of the United States for summary judgment with regard to Issue III is hereby granted.

## CONCLUSION

Summary judgment will be granted as to Issues I and III, in favor of the United States as defendant, and denied as to Issue II. A schedule relating to trial in the transferor court of plaintiff's allegations stated with relation to Issue II will forthwith be discussed with counsel.

---

59. *See* the discussion of the discretionary exception at p. 968 et seq., *supra,* of this opinion.